(July 15, 1916.)

ROME ADAMS et al., Plaintiffs, v. TWIN FALLS–OAKLEY
LAND & WATER COMPANY, a Corporation, et al.,
Defendants.

[161 Pac. 322.]

CAREY ACT LEGISLATION CONSTRUED—CONSTRUCTION LIENS ON LAND AND
WATER RIGHT—DEFAULT BY SETTLER—STATUTORY FORECLOSURE EX-
CLUSIVE REMEDY—CONTRACT BETWEEN CONSTRUCTION COMPANY AND
SETTLER—CONTRACTUAL PROVISION FOR DEPRIVATION OF WATER ON
DEFAULT—PUBLIC POLICY.

1. Under Federal and State Carey Act legislation (29 Stats. at
Large, 434, and sec. 3288, Rev. Codes), first liens for the cost of
construction of irrigation works are authorized to be created on the
land and water right in order to insure the construction company a
return of the initial cost of construction and a reasonable profit on
the investment. Any lien thus created for the original cost of con-
struction, together with the interest thereon, is subject to foreclosure
and sale under the provisions of sec. 1629, Rev. Codes, and upon
default by the settler in the payment of instalments of principal
or interest in accordance with his contract with the construction
company for the purchase of water right, the company should resort
to the security afforded it by the creation of such liens and the
enactment of such statutory procedure which constitute an exclu-
sive remedy.

2. Where a person, association or corporation contracts to de-
liver a certain quantity of water to any party or parties and the
amount to be paid by said party or parties for the delivery of such
water is fixed by contract or provided by law, it becomes a first lien
upon the land for the irrigation of which said water is furnished
and delivered, independent of the lien fixed by contract for the
initial cost of construction of the irrigation works; and if the title
to said tract of land is in the United States or the state of Idaho,
then the said amount becomes a first lien upon any crop or crops
which may be raised upon said tract of land during such irrigation
season; and these liens may be recorded and collected as provided
by law. (Sec. 3288, Rev. Codes.)

3. Paragraph 1 of the contract between the defendant construc-
tion company and the settler recites that "This agreement is made
in accordance with the provisions of said contract between the
State of Idaho and the company, which, together with the laws of

the state of Idaho under which this agreement is made, shall be regarded as defining the rights of the respective parties." The contract between the state and the construction company contains no provision authorizing the construction company to withhold delivery of water for nonpayment of principal or interest by the settler on his water contract; neither do the laws of the state sanction such provision in the contract between the company and the settler.

4.   The contract between the construction company and the plaintiffs in this case contains the following provision: "It is agreed that no water shall be delivered to the purchaser from said irrigation system while any instalment of principal or interest is due and unpaid from the purchaser to the company or while any toll and assessment is due and unpaid from the purchaser to the Oakley Canal Company. . . . . " It being admitted in this case that plaintiffs have paid the fixed charges made by the construction company through the operating company for the operation and maintenance of the irrigation works during the season of 1916 for the lands held by them respectively, and that there is an ample supply of water available for distribution, said provision contravenes sec. 3240, Rev. Codes, and in particular the final clause of said section, which is as follows: "And the right to continue the use of any such water shall never be denied or prevented from any other cause than the failure on the part of the user thereof to pay the ordinary charges or assessments which may be made to cover the expenses for the delivery of such water." Said provision in the contract is therefore unenforceable and void.

5.   The enforcement of a provision in a contract between a Carey Act construction company and a settler empowering the company to deprive the settler of the right to the use of water on his failure to make payments upon the original contract debt might prevent the settler from making proof which would entitle him to a deed, and prevent the state from procuring patent to the lands within the Carey Act project. This result would destroy the security out of which the construction company seeks reimbursement for the cost of construction and thereby render valueless its lien upon the land. It would also result in the public waters of the state not being applied to the highest beneficial use. Even from these considerations alone, such contractual provision is contrary to public policy, and can only be resorted to as provided by law for the collection of ordinary charges for maintenance of works and operating expenses properly incident to the delivery of water.

[As to validity of rules and regulations of irrigation company, see note in **Ann. Cas. 1912D, 137.**]

Original application for writ of mandate to compel the delivery of water for irrigation purposes. Peremptory writ issued.

W. L. Dunn, for Plaintiffs.

Having paid the maintenance and operating expense as fixed for the season of 1916, it is the duty of defendants to deliver the water for the irrigation of plaintiffs' crops, and determine the question of arrears on the contract afterward. (*Shelby v. Farmers' Co-Op. Ditch Co.*, 10 Ida. 723 (738), 80 Pac. 222.)

"The law in force when a contract is made is a part of such contract as fully as if its provisions had been incorporated into such contract." (2 Page on Contracts, par. 1117; 9 Cyc. 582.)

"The attempt to contravene the policy of a public statute is illegal, nor is it necessary to render it so that the statute contain an express prohibition of such attempt." (*Sharp v. Teese*, 9 N. J. L. 252 (254), 17 Am Dec. 479.)

"Forfeitures, under the well-known rule of law, are not favored, and such contracts will be strictly construed against the company, especially where the consumer has the right of compulsory service." (Kinney on Irrigation and Water Rights, 2d ed., sec. 1528; *Shelby v. Farmers' D. Co., supra.*)

There is a statutory duty to furnish the water under the Carey Act, and upon the payment of the rentals and tolls for the operation and maintenance of the system for the irrigating season of 1916, it is the duty of the company to furnish the water. (*Mandell v. San Diego etc. Co.*, 89 Fed. 295; *San Diego etc. Co. v. Sharp*, 97 Fed. 394, 38 C. C. A. 220.)

By the enforcement of clause 6 of the contract, defendants may withhold the waters from plaintiffs' lands, and foreclose without proceeding in the ordinary tribunals, and deny the plaintiffs their equity of redemption which is provided to them by sec. 1629, Rev. Codes. This is in all respects contrary to the established policy of the state in husbanding its waters, and a plain violation of the constitutional rights of plaintiffs.

(Const., art. 15, secs. 1, 2, 4; *Wilterding v. Green,* 4 Ida. 773, 45 Pac. 134.)

Any policy that works contrary to an economical, beneficial use of the waters is discountenanced. (*State v. Twin Falls Canal Co.,* 21 Ida. 410, 121 Pac. 1039; *Van Camp v. Emery,* 13 Ida. 202, 89 Pac. 752; *Farmers' etc. Ditch Co. v. Riverside Irr. Dist.,* 16 Ida. 525, 102 Pac. 481.)

What right has the operating company, at the mere suggestion of the construction company, in anybody's control, to arbitrarily assist it in the collection of its past due bills, to the extent of withholding water from the lands of plaintiffs, even if based on a clause in a contract? (*Hatch v. Consumers' Co.,* 17 Ida. 204, 104 Pac. 670, 40 L. R. A., N. S., 263.)

The defendant construction company's right is only to the extent created for the purpose of permitting it to appropriate for sale and delivery, as provided by law, in its capacity as a *quasi*-public corporation, the quantity agreed to be delivered to the lands of plaintiffs, whether these lands may remain in the hands of plaintiffs or pass to the hands of some other qualified entrymen or purchasers. The only other interest of this company in this water is by virtue of its lien, whether it be called a mortgage, mechanic's lien or special statutory lien. (*Bennett v. Twin Falls N. S. L. & W. Co.,* 27 Ida. 643, 150 Pac. 336.)

J. H. Peterson, Attorney General, D. A. Dunning and Herbert Wing, Assts., for Plaintiffs.

Under the constitution and laws of the state and the decisions of this court, after the water has once become appurtenant to a certain tract of land, the land and water cannot be separated to the injury of any other person or unless consented to by the owner of the land. (*Hard v. Boise City Irrigation & Land Co.,* 9 Ida. 589, 76 Pac. 331, 65 L. R. A. 407.)

S. H. Hays and P. B. Carter, for Defendants.

"There is nothing to compel either a municipality or a water company to furnish water to one who will not pay for

it, and a regulation that in case the consumer is in default, his supply will be cut off, is reasonable and may be enforced." (1 Farnham on Waters, sec. 164a; *Hatch v. The Consumers' Co.*, 17 Ida. 204, 104 Pac. 670, 40 L. R. A., N. S., 263.)

The contracts here in question were directly and fully. agreed to in the most formal manner and were afterward approved by the state authorities. Entrymen were not required to take land. There was no obligation upon them to do so. They took it of their own volition. (*Idaho Irr. Co. v. Pew*, 26 Ida. 278, 141 Pac. 1099.)

Conditional sale contracts may lawfully be made whereby, in case of failure to make payment, the owner may retake the property. (*Pease v. Teller Co.*, 22 Ida. 807, 128 Pac. 981.)

An attack upon contracts upon the ground that they are against public policy is not favored by the courts. (*Baltimore & O. S. Ry. Co. v. Voigt*, 176 U. S. 498 (504) ; 20 Sup. Ct. 385, 44 L. ed. 560.)

Even in the case of public service corporations, where there is a repudiation of a just debt, the person may be refused further service. (Wyman on Public Service Corporations, sec. 448.)

We are under no obligation whatever to permit the use of the property, that is, the proportionate part of the ditch owned by the settler and the appurtenant water supply, unless he keeps up his instalments, and this result would come about without inserting such a paragraph as paragraph 6 in the contract. (Page on Contracts, sec. 1489.)

While the settler is not performing the contract upon his part and has no legal excuse for not performing, we are not required to keep up a performance on our part. (Hammond on Contracts, sec. 454; Elliott on Contracts, sec. 1590.)

A. M. Bowen, *Amicus Curiae*.

When water is ready for delivery in the irrigation system, the construction company shall notify the. settler under the irrigation works that they are prepared to furnish water under the terms of their contract with the state, and within

a certain specified time after notice certain reclamation must be done by the settler. The settler cannot delay; *he must proceed.* (Sec. 1628, Rev. Codes; *Hanes v. Idaho Irr. Co.,* 21 Ida. 512, 122 Pac. 859.)

While the national Carey Act only recognizes the right to a lien upon the land, the state statute authorizes the creation of the lien upon both the land and water, and said latter provision is in harmony with the provisions of Congress. (*Idaho Irr. Co. v. Pew,* 26 Ida. 272, 141 Pac. 1099.)

The company, like the settler, takes its risks, and if the settler is unable to pay his deferred payments, the company has no right to destroy the prosperity of the state, to deprive the United States and the state of the benefits which were intended to flow to them from the development and reclamation of the public lands, to impair or destroy the very thing and purpose for which the lands were segregated and donated to the state, but it was the intent of Congress and the intent of the legislature that the company would have a lien upon the land and the water, and that it could foreclose this lien and transfer such land and water to other persons. Such procedure does not call for the deprivation of water, but carries with it the idea that the furnishing of water shall continue and be transferred upon the foreclosure of the lien.

Richards & Haga, *Amici Curiae.*

Judicial tribunals hold themselves bound to the observance of rules of extreme caution when invoked to declare a transaction void on grounds of public policy, and prejudice to the public interest must clearly appear before a court would be warranted in pronouncing a transaction void on this account. The power of courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt. (*Smith v. Du Bose,* 78 Ga. 413, 6 Am. St. 260, 3 S. E. 309; *United States v. United Shoe Machinery Co.,* 222 Fed. 349, 407; *People v. Hawkins,* 157 N. Y. 1, 68 Am. St. 736, 51

N. E. 257, 42 L. R. A. 490; *Hollis v. Drew Theological Seminary,* 95 N. Y. 166; *Girard Will Case (Vidal v. Girard),* 43 U. S. (2 How.) 127, 11 L. ed. 205.)

A person who applies for service, whether it be water, gas or electric current, and subscribes to regulations to the effect that the supply may be discontinued if the consumer fails or neglects to pay his bills when due, cannot repudiate the contract after he has obtained the benefit thereof, and the alleged public policy involved does not go to the extent of forbidding such contracts. (*Mackin v. Portland Gas Co.,* 38 Or. 120, 61 Pac. 134, 62 Pac. 20, 49 L. R. A. 596; *State v. Butte Electric and Power Co.,* 43 Mont. 118, 115 Pac. 45; *City of Mansfield v. Humphreys Mfg. Co.,* 82 Ohio St. 216, 19 Ann. Cas. 842, 92 N. E. 233, 31 L. R. A., N. S., 301; *Tacoma Hotel Co. v. Tacoma Light & Water Co.,* 3 Wash. 316, 28 Am. St. 35, 28 Pac. 516, 14 L. R. A. 669; *People v. Paris Mountain Water Co.,* 81 S. C. 443, 128 Am. St. 923, 62 S. E. 874; *State v. Board of Water etc. Commrs.,* 105 Minn. 472, 127 Am. St. 581, 117 N. W. 827; Pond on Public Utilities, sec. 220.)

Longley & Walters, *Amici Curiae.*

This court in *Shelby v. Farmers' etc. Ditch Co.,* 10 Ida. 723, 80 Pac. 222, refers to sec. 3289, Rev. Codes, which provides that canal companies must furnish water to any person who shall make a proper demand therefor, and furnish reasonable security for the payment thereof, and says "It protects parties who are willing to invest large sums of money in an enterprise that brings slow return. It is not an unreasonable requirement of the consumer and only furnishes the producer with reasonable protection for furnishing water."

Can it be seriously urged that the provision of the contract here in issue does not come squarely within the rule so announced by the court?

The parties to the action have contracted that the water company may do the very thing which has been done in the present action, and the water company is not bound to rely upon any rule or regulation, or statutory provision, but must .

have the right to rely upon the express terms of the contract between the parties. (*Jackson v. Indian Creek etc. Irr. Co.,* 16 Ida. 430, 101 Pac. 814.)

The provisions of our statute give the construction company the right to enter into a contract with the state and with the settler, controlling "the price and *terms* per acre at which such works and perpetual water rights shall be sold to settlers." In the Jackson case, the court clearly held that the statute authorized the parties to contract in relation to these matters, and the Carey Act statute likewise authorizes such contracts. (*San Diego Flume Co. v. Souther,* 60 Fed. 164, 32 C. C. A. 548.)

"If as soon as an entryman makes a contract for the purchase of water from a construction company to irrigate his land, the water becomes an inseparable appurtenance to such land, the terms of the contract which provide that the land and water company may refuse to deliver water, unless payments are made in accordance with the contract, would be absolutely without any value or force whatever, and the entryman would secure his water without regard to his payments therefor. No such inequitable construction of said contracts would be tolerated by any court." (*Bennett v. Twin Falls etc. Co.,* 27 Ida. 643, 653, 150 Pac. 336.)

W. G. Bissell, *Amicus Curiae,* cites no authorities.

BUDGE, J.—This is an original proceeding brought in this court upon plaintiffs' petition for writ of mandate to compel the defendants to deliver water for irrigation purposes to the plaintiffs, who are settlers upon what is commonly known as the Oakley Carey Act Project, situated in Cassia county.

The Twin Falls-Oakley Land & Water Company which, for brevity, will hereafter be called the construction company, entered into a contract with the state of Idaho through its state board of land commissioners on August 12, 1909, wherein and whereby it was agreed that certain irrigation works should be constructed for the purpose of irrigating a

large area of land located in Cassia county. After the state contract was entered into a form of contract was prepared by the construction company to be entered into between the settlers upon the project and the construction company, and was presented to and approved by the state board of land commissioners. Thereafter the land included within the project was thrown open for entry and settlement.

When the land was thrown open for entry and settlement a considerable portion of it was regularly filed upon by various persons who entered into the contracts with the construction company previously approved by the state board of land commissioners. These contracts were duly executed by the entrymen and the construction company. Under the terms of these contracts, the first deferred payment became due April 1, 1912, and upon the first day of April each and every year thereafter until the entire purchase price, together with accrued interest, was paid.

By reason of the failure of the construction company to complete the construction work of the project within the time stipulated in the original° contract, and the inability of certain settlers to promptly meet their payments, by mutual agreement between the construction company and the settlers, payment of both principal and interest was extended, and thereafter an extension agreement which became a part of the original contract was entered into between some of the settlers and the construction company whereby the principal debt was extended to 1919, but in the meantime interest payments were to be made.

Among the settlers there were a few who are known as "old settlers," who had patented lands or had made filings on government lands within the project prior to the segregation. These old settlers entered into what is known as the extension agreement, and, so far as this case is concerned, occupy the same position with reference to the question to be determined here as the regular Carey Act entrymen, for the reason that their rights under the contract with the construction company appear to be identical with the rights of the entrymen.

Some of the plaintiffs here who were Carey Act entrymen failed or refused to sign the extension agreement. But they, with the plaintiffs who did sign the extension agreement, will be affected by the conclusions reached in this case in the same manner and to the same extent as though they had signed the extension agreement.

It is, we think, admitted that none of the plaintiffs herein have made payments of either the principal or interest on the initial indebtedness, according to the terms and conditions of the contract with the construction company. But it is equally true that all of the plaintiffs have paid the fixed charges made by the construction company through the operating company (Oakley Canal Company) for the operation and maintenance of the irrigation works for the irrigating season of 1916, for the lands held by them respectively.

The contention between the construction company and all of the plaintiffs involves the validity of a portion of paragraph 6 of the original contract, which was also by the construction company made a part of the extension agreement, and is as follows:

"It is agreed that no water shall be delivered to the Purchaser from said irrigation system while any instalment of principal or interest is due and unpaid from the Purchaser to the Company or while any toll and assessment is due and unpaid from the Purchaser to the Oakley Canal Company. . . . "

It is the contention of the plaintiffs that the above portion of paragraph 6 of the contract is void and unenforceable, for the reason that it is against public policy and, we might add, in contravention of the statutes of this state regulating the right to the use of the waters of the state for irrigating purposes, and is repugnant to other provisions of the contract.

Paragraph 1 of the contract, among other things, provides: "This agreement is made in accordance with the provisions of said contract between the State of Idaho and the Company, which, together with the laws of the State of Idaho under which this agreement is made, shall be regarded as defining

the rights of the respective parties." Paragraph 8 of the contract provides: "This contract is made pursuant to and subject to the contract between the Company and the State of Idaho and the existing laws of said State."

An examination of the contract between the state and the construction company shows that it contains no provision which authorizes the construction company to refuse the delivery of water where the entryman is in default in the payment of either principal or interest on his water contract with the construction company. This clearly indicates that such a procedure was not contemplated by the state or the construction company when that contract was entered into. Nor, as we view it, could such a provision have been legally inserted in the contract between the state and the construction company.

And since such a provision was clearly not authorized by the contract between the state and the construction company, in order to determine whether or not the construction company could legally refuse to deliver water from its irrigating system to the entryman under his contract during any irrigating season for failure to pay an original indebtedness, we must ascertain what particular provisions of the statutes of this state defining the rights of the construction company and the entryman were in force when the contract was made.

Section 3240, Rev. Codes, provides that "Water being essential to the industrial prosperity of the state, and all agricultural development throughout the greater portion of the state depending upon its just apportionment to, and economical use by, those making a beneficial application of the same, its control shall be in the state, which, in providing for its use, shall equally guard all the various interests involved. All the waters of the state, when flowing in their natural channels, including the waters of all natural springs and lakes within the boundaries of the state are declared to be the property of the state, whose duty it shall be to supervise their appropriation and allotment to those diverting the same therefrom for any beneficial purpose, and the right to the use

of any of the waters of the state for useful or beneficial purposes is recognized and confirmed; and the right to the use of any of the public waters which have heretofore been or may hereafter be allotted or beneficially applied, shall not be considered as being a property right in itself, but such right shall become the complement of, or one of the appurtenances of, the land or other thing to which, through necessity, said water is being applied; *and the right to continue the use of any such water shall never be denied or prevented from any other cause than the failure on the part of the user thereof to pay the ordinary charges or assessments which may be made to cover the expenses for the delivery of such water."*

The foregoing statutory provision was enacted by the legislature in harmony with and to carry out the provisions of sec. 1, art. 15, of the constitution of this state, which provides in substance that the use of all waters now appropriated or that may hereafter be appropriated for sale, rental or distribution is declared to be a public use, and subject to the regulation and control of the state in the manner prescribed by law.

The same may be said of sec. 3288, Rev. Codes, which provides, among other things: "The amount to be paid by said party or parties for the *delivery* of said water, which amount may be fixed by contract, or may be as provided by law, is a first lien upon the land for the irrigation of which said water is furnished and delivered. But if the title to said tract of land is in the United States or the state of Idaho, then the said amount shall be a first lien upon any crop or crops which may be raised upon said tract of land, which said lien shall be recorded and collected as provided by law for other liens in this state. And any mortgage or other lien upon such tracts of land that may hereafter be given, shall in all cases be subject to the lien for price of water as provided in this section."

These statutory provisions limit the expense which will authorize a refusal by a construction company, a *quasi*-public corporation, to deliver water, where, as in the case at bar, the

construction company has ample water for delivery, to the ordinary charges or assessments necessary to cover the maintenance and operating expenses for the delivery of such water, and this does not extend to any prior or initial indebtedness. And where the title to the land is in the United States or the state of Idaho, the ordinary charges or assessments to cover the expense for the delivery of such water becomes a first lien upon any crop or crops which may be raised upon the lands furnished with water. This lien is subject to foreclosure in the manner provided by law, and constitutes a prior lien upon the crops raised on the lands thus furnished with water.

It is evident from a careful reading of the contract made between the construction company and the settler that the company did not rely upon paragraph 6 of its contract for the penalty to be imposed for the failure on the part of the settler to comply with the conditions of the contract in the matter of making deferred payments together with the interest therein provided for, but it relied upon other provisions of the contract.

Paragraph 3 of the contract provides, among other things: "Interest . . . . at 6 per cent per annum, shall be paid annually, but if interest is not paid within thirty days from the date the same falls due, then in such case it shall be computed for the entire period at the rate of eight per cent per annum."

Paragraph 4 provides: "The Purchaser hereby covenants and agrees that upon default in the payment of any of the payments above specified, or of the interest thereon, or of any annual charge, toll, or assessment, for the operation and maintenance of the irrigation system hereinbefore provided for, the Company may declare the entire amount of the principal purchase price for said water rights due, and may proceed either in law or equity to collect the same, and to enforce any lien which it may have upon the water rights hereby contracted, or upon the lands to which said water rights are dedicated, or may at its option proceed to enforce any remedy

given by the laws of Idaho to the Company against the Purchaser.

"And the Purchaser hereby further covenants that he will and by these presents does hereby grant, assign, transfer, and set over, by way of mortgage or pledge to the Company to secure the payment of the amounts due and to become due on the purchase price of the water rights hereby contracted to be sold, any and all interest, and all rights which he now has or which may hereafter accrue to him under his contract with the State of Idaho, for the purchase of the lands to which the water rights hereby contracted for are dedicated, and further, that immediately upon transfer to him of the legal title to said lands or any part thereof, he will, upon demand, execute to the Company in proper form, a mortgage or deed of trust with power of sale in such form as may be approved by the State Board of Land Commissioners to secure the performance by him of the provisions of this contract, which said mortgage the Purchaser hereby covenants and agrees shall be a first lien upon the lands so mortgaged, superior to any and every incumbrance in favor of any persons whomsoever."

It will therefore be readily seen that the construction company contracted with the Purchaser that, upon his default in the payments of the interest within thirty days after due, the penalty would be the increase in the computation of the interest rate from six to eight per cent per annum, and that a prior lien was to be created in favor of the construction company upon the water right contracted for and upon the lands to which the water was dedicated immediately upon the vesting of the title in the Carey Act entryman.

The federal government when making the grant of the Carey Act land to the state authorized the creation of a lien thereon for the cost of the construction of the works (29 Stats. at Large, 434), and the state, by legislative enactment (sec. 3288, Rev. Codes), created a lien on both the land and the water right to insure to the construction company a return of the initial cost of construction and a reasonable profit

on the investment. (*Childs v. Neitzel* (on rehearing), 26 Ida. 133, 141 Pac. 77.) Two separate and distinct liens were thereby created to secure the payment of the cost of the construction of the works and the operation. One was a lien on the land itself, which lien attaches when the necessary proof has been made by the entryman and patent issued to the state and a conveyance by the state to the entryman. The existence of this lien depends primarily upon the completion of the construction works and the delivery of water through the works by the construction company as stipulated in its contracts with both the state and the entryman. The other was a lien on the water right which, under the terms of the contract, is mortgaged or pledged to the construction company. It hardly seems reasonable to indulge the presumption that the construction company, without resorting to an action to foreclose either of these liens, would be authorized to summarily and at any time during the life of the contract with the entryman deprive him of water when it had an abundance, and thus cut off his right of redemption under the lien upon the land and of his right of defense, if he had any, to proceedings instituted under the mortgage or pledge of his stock in the operating company to the construction company, for the purpose of collecting the initial cost of construction, regardless of whether a portion of the same were in dispute at the time of the refusal to deliver water or at a subsequent time during the life of the contract.

The construction company, under the terms of the contract, upon the failure of the entryman to make payment of principal or interest as therein specified, is authorized to declare the entire indebtedness due. In our opinion, when it so declares the indebtedness due, it becomes vested with the right to proceed as provided by section 1629, Rev. Codes. Said section of the statutes authorizes the lien and foreclosure for the purchase price of the water right contracted for, and is to the effect that the construction company securing water for any tract of land "shall have a first and prior lien on said water right and land upon which said water is used, for all

deferred payments for said water right; said lien to be in all respects prior to any and all other liens created or attempted to be created by the owner and possessor of said land; said lien to remain in full force and effect until the last deferred payment for the water right is fully paid and satisfied according to the terms of the contract under which said water right was acquired.''

Then follows the remedy provided in the event the unpaid purchase price of the water right shall not have been paid. It is provided that upon default of deferred payments secured by any of the liens under the provisions of this chapter, the construction company holding or owning said lien ''may foreclose the same according to the terms and conditions of the contract granting and selling to the settler the water right.''

Next follows the provision with reference to the manner of foreclosure, the publication of notice and the sale by the sheriff, at which sale it is provided that no person or company owning or holding any lien shall bid in or purchase any land or water right ''at a greater price than the amount due on said deferred payment for said water right and land, and the costs incurred in making the sale of said land and water right.''

And further, that at any time within nine months after the foreclosure sale by the sheriff of the land and water rights, the original owner may apply to the person or company purchasing at such sale, ''to redeem such land and water rights and the purchaser shall assign the certificate of sale of such land and water rights to such original owner, upon the payment by him within such nine months, of the amount of the lien for which the same was sold at such foreclosure sale, together with the interest, costs and fixed charges thereon.''

It is also provided that where the lienholder becomes the purchaser at such foreclosure sale, if such land and water rights are not redeemed by the original owner within nine months, then at any time within three months after the expiration of such nine months, any person desiring to settle

upon and use such land and water rights, "may apply to the purchaser at such foreclosure sale to redeem such land and water rights, and such purchaser shall assign the certificate of sale of such land and water rights to the person desiring to redeem the same, upon the payment by him, within such three months, of the amount of the lien for which the same was sold at such foreclosure sale, together with the interest, costs and fixed charges thereon."

From a careful consideration of the foregoing statutory provisions, it would seem to be clear that the legislature never intended to authorize persons, associations or corporations engaged in the delivery of water for the irrigation of the arid lands of this state to deprive the citizens of the state of the right to the use of such waters, except upon their failure to pay the ordinary charges or assessments to cover the actual expenses incurred for the maintenance, operation and any other necessary expense incident to the delivery of such water. Any lien created for the original cost of construction, together with interest thereon, is subject to foreclosure and sale by a procedure somewhat analogous to the general procedure for the foreclosure of mortgages, as provided for in section 1629, *supra*. It was clearly the intention of the legislature, as well as the construction company, that the individual contract holder or settler should be the owner of the water right upon completion of the construction works. This water right was to be represented by corporate stock in the operating company organized by the construction company. The operating company was to operate the canal and the waters flowing therein for the benefit of the settlers who ultimately, upon making final payment, were to become the owners of all the capital stock of the operating company.

The construction company has organized the operating company, known as the Oakley Canal Company, but retains control, under its contracts with the settlers, of this operating company and its administration of the functions of the completed irrigation works of the construction company. From this it might be contended that the construction company

could in no wise be benefited by the entrymen's payment of the cost of maintenance and operating charges for the delivery of the water through the irrigating system, because that would not reduce the initial cost of construction. While the initial cost of construction may not be immediately reduced in this manner, yet the security of the construction company's investment is increased proportionately with the improvements made by the settlers upon the project, and the entrymen's ability to meet the initial payments together with interest thereon is augmented. The cultivation and reclamation of the lands located on by the entrymen fulfils the terms of the grant from the general government of the lands within the project, and makes the security of the construction company tangible.

It is apparent that the legislature intended to fully protect the construction company to the extent that it be reimbursed for the moneys expended in the construction of the works, together with reasonable profit on the investment. To this end it provided the statutory liens heretofore defined and a complete, exclusive statutory procedure for the foreclosure of these liens. But the entire plan of the Carey Act, the segregation of the land, the authorization for the state to make contracts with the construction companies, to induce settlement and cultivation of such lands, the creation of liens upon the lands and the water rights, and the provisions for the foreclosure of the same, all clearly tend to establish that it was also the intention of the legislature that the settler should obtain at least a part of the funds necessary for the payments of his water rights from the profits resulting from his investments in the lands upon the segregation, his occupancy and reclamation of the same. This object cannot be attained if the enjoyment of the right to the use of the water be denied the settler. The deprivation of the settler's right to the use of the water by reason of his failure to make payments under the terms of his contract with the construction company upon the initial indebtedness, together with interest thereon, might frustrate the purposes of the Carey Act and

the legislation of this state, and result in decreasing the security of the construction company under its contract.

Thus, if we sustain the provisions of paragraph 6 of the contract, and thereby empower the construction company, through the operating company, to deprive the settler of the right to the use of the waters on his failure to make payments upon the original contract debt, it might prevent the settler from making proof which would entitle him to a deed, and the state from procuring patent to the lands within the project. This would destroy the security the construction company has out of which it is to be reimbursed for the initial cost of construction with reasonable profit, and render valueless the construction company's lien upon the land. It would also result in the public waters of the state not being applied to the highest beneficial use at all times and under all circumstances, which is contrary to the policy of this state as declared by the constitution and laws, as well as the decisions of the courts.

We think it is safe to say that it has always been the policy of this state that no interruption other than that expressly provided for by statute may be interposed to defeat the highest possible use of the public waters of the state.

In our opinion the above-mentioned provision of paragraph 6 of the contract is too harsh and unreasonable to be resorted to for the collection of the initial indebtedness due the construction company under its contract with the entrymen. Such a provision could only be resorted to as provided for by the statutes for the collection of the ordinary charges for maintenance and operating expenses for the delivery of the water.

Reference has been made to the case of *Bennett v. Twin Falls etc. Co.*, 27 Ida. 643, 150 Pac. 336, wherein paragraph 6 of the contract now under consideration was incidentally discussed. The question raised in the case at bar was not before the court in that case, and was not determined.

In that case, the land to which the water had theretofore been applied was lawfully assessed for taxes for the year 1910, which were not paid and became delinquent. The land was thereafter sold for taxes to Lincoln county. No redemp-

tion being made, a tax deed issued to Lincoln county, and was subsequently by Lincoln county sold to the plaintiff Bennett, who contended that the unpaid water right, being appurtenant to the land, was also sold with the land for taxes, and that he was entitled to a conveyance of the water right from the defendant company. This court held that under the provisions of sec. 1629, Rev. Codes, the water right referred to therein did not attach or become such an appurtenance to the land that the title to such water right was conveyed under a tax deed which conveyed the title to the land, where the purchase price of the water right had not been paid, and that the plaintiff under his tax deed occupied the same position as the original entryman, and in order to secure the water right under the contract with the construction company, it was incumbent upon him to make payments in accordance with the terms and conditions of the water contract, and that the water company could be compelled to furnish water in accordance with the terms of the contract upon the plaintiff's making payments as therein stipulated.

But it was not the intention of this court in that case to hold that the water company could deprive a Carey Act entryman of the use of water upon his failure to make payment of principal or interest on the initial indebtedness.

For the reasons above given, the writ of mandate prayed for must issue directing the said defendants to deliver water to each of the plaintiffs herein in the quantity available and to which they are severally entitled, for the irrigation of their lands. Costs of this proceeding are awarded to plaintiffs.

Sullivan, C. J., and Morgan, J., concur.