TWIN FALLS SALMON RIVER LAND & WATER CO. v. ALEXANDER et al.

(District Court, D. Idaho, S. D.   January 3, 1919.)

No. 587.

1. WATERS AND WATER COURSES ⬥222—RECLAMATION—CAREY ACT—APPLICATION FOR PATENT.

Bill by construction contractor for a Carey Act project, complaining of board representing a state in such projects, because not applying for patent for all lands included in the project, though there is water available only for part, *held* without equity.

2. COURTS ⬥303(2)—FEDERAL COURTS—SUIT AGAINST STATE.

Bill by contractor for Carey Act project, complaining of board representing state in such projects, because of it not applying for patent for all lands included in project, but only for amount for which it deems there is water available, *held* within Const. Amend. 11, withdrawing from jurisdiction of federal courts suits by individuals against a state.

3. WATERS AND WATER COURSES ⬥222—CAREY ACT PROJECT—ADEQUACY OF WATER SUPPLY—RELIANCE OF CONTRACTOR ON STATE ENGINEER'S REPORT.

A construction contractor for a Carey Act project in Idaho can claim no protection or advantage, on it developing that there was not water available for all the lands of the project, because the state engineer, in approving the original proposal, reported the sources of water to be ample; neither he nor the state or its land board taking the initiative or making representations to a promoter, and the engineer's report being only for the benefit of the board.

4. EVIDENCE ⬥474(1)—OPINION—RELIANCE ON REPORT.

Testimony of a witness, who was never an officer or representative of a corporation, that it placed reliance on a report, is incompetent to establish the fact, being nothing but his present personal opinion.

5. WATERS AND WATER COURSES ⬥222—CAREY ACT PROJECT—PERFORMANCE OF CONTRACT—DETERMINATION.

It is for the Idaho state land board in the first instance to determine in what particulars contract work on a Carey Act project is unfinished, and to consider whether, in view of the developed fact of insufficient sources of water, anything further will be required, and, till the contractor has taken proper steps to have this done, it cannot maintain suit against the board for a determination of the questions.

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Suit by the Twin Falls Salmon River Land & Water Company against M. Alexander and others, as members of the State Board of Land Commissioners of Idaho, and the Salmon River Canal Company, Limited. Dismissed conditionally.

Richards & Haga and McKeen F. Morrow, all of Boise, Idaho, for plaintiff.

T. A. Walters, Atty. Gen., and A. C. Hindman, Asst. Atty. Gen., for defendants.

DIETRICH, District Judge. The plaintiff, a Carey Act corporation, and its assignors, promoted, and, under a contract with the state, constructed, the Salmon River Carey Act project. The law governing projects of this character is to be found in the United States statutes (Act Aug. 18, 1894, c. 301, § 4, 28 Stat. 372, 422 [Comp. St. § 4685]; Act June 11, 1896, c. 420, § 4, 29 Stat. 413, 434; Act March 3, 1901, c. 853, § 3, 31 Stat. 1133, 1188 [Comp. St. § 4687]; Resolution May 25, 1908, No. 28, 35 Stat. 577 [Comp. St. § 4688]; and Act May 27, 1908, c. 200, 35 Stat. 317, 347), and in the laws of Idaho (Const. art. 9, § 7) and the Idaho Revised Codes (sections 149, 150, 1558, and sections 1613 to 1634, inclusive). The defendants are respectively the Governor, the attorney general, the secretary of state, the auditor, and the superintendent of public instruction of the state, who ex officio constitute the state board of land commissioners. As such board they represent the state in all public matters affecting Carey Act projects. With considerable detail the bill charges that, although the plaintiff has substantially completed the project and has performed its contract in so far as is practicable, the defendants arbitrarily neglect to approve the work or accept the system, and, upon the other hand, without reason defer all action in the premises, and harass and injure the plaintiff by threatening litigation and encouraging the settlers to refuse payments under their contracts for water rights.

In a supplemental complaint it is further charged that, in violation of the plaintiff's rights and greatly to its prejudice, the defendants intend to make application for patent for only about 35,000 acres of land included in the project, and threaten to relinquish approximately 20,000 acres for which plaintiff has sold water rights, and upon which it claims liens to secure the payment of the purchase price thereof. The prayer is somewhat voluminous, but in substance it is that it be decreed that the plaintiff has completed the irrigation system in compliance with the plans and specifications, "in so far as the same are applicable to the conditions now existing under said project, and in so far as" the plaintiff ought under the circumstances to be required to construct the same; further, that, if it be held that the system is unfinished, the deficiencies may be pointed out, to the end that the plaintiff may be able to complete performance; and, further, that it be decreed that the system be turned over to the Salmon River Canal Company, the company organized for the purpose of maintaining and operating the system, and that the plaintiff be relieved from all further liability under its agreement for the construction of the system; and,

further, that the defendants be enjoined from bringing any suit to cancel or annul the agreement, and from taking any steps in any way to impair the plaintiff's lien upon the lands embraced in the project, and particularly from relinquishing to the United States any of such lands.

It is unnecessary to detail the numerous issues formally raised by the answers to these pleadings, for the reason that upon final analysis of the record there appear to be but two or three controlling questions, and they can be understood without an elaborate statement of fact. (The project was also involved in Twin Falls Salmon River Land & Water Co. v. Caldwell et al., 242 Fed. 177, 155 C. C. A. 17; and State v. Twin Falls Salmon River Land & Water Co., 30 Idaho, 63, 166 Pac. 220, to which resort may be had for additional information.) Admittedly the enterprise was improvident, in that it contemplated the reclamation of an area greatly in excess of any possible water supply. The original proposal of the plaintiff's assignors to the land board was for the reclamation of about 150,000 acres, and the segregation was for approximately that amount. At a comparatively early date, however, the plaintiff seems to have concluded that the area was excessive, and the system was constructed, so the plaintiff alleges, with a capacity sufficient for only 100,000 acres. But even this capacity was in excess of the available water supply, and hence, it is further averred in the complaint, with the consent of all parties concerned, the acreage was reduced from time to time until, when the suit was commenced water contracts were outstanding for a little more than 60,000 acres. The plaintiff does not here expressly affirm that the supply is sufficient for even that acreage, and, upon the other hand, the defendants, apparently with the support of the Land Department of the United States, contend that there is water enough for only about 35,000 acres.

In view of the plaintiff's admission that the water supply is grossly inadequate for the enterprise as originally projected, and its failure to tender an issue as to the amount of water actually available, and the further obvious, if not admitted, fact that the acts and omissions of the state board, of which it here complains, are in the main referable to the contention consistently made by it of the inadequacy of the water supply, we must assume for the purposes of the case that there is sufficient water for only about 35,000 acres, or at least that the defendants reasonably and in good faith so believe. With water right contracts, all apparently of equal dignity, out for 60,000 acres, and with a water supply for only 35,000 acres, with the system incomplete, according to the original plans, and wasteful of water and unnecessarily expensive to maintain by reason of the oversize of the principal conduits for a tract of 35,000 acres, or even 60,000 acres, what was the plain duty of the land board? The plaintiff says: Approve of and accept the system so constructed, authorize its transfer to the settlers, thus relieving it from further responsibility, and apply for a patent for the entire 60,000 acres. The board, upon the other hand, has maintained that the excess of outstanding water contracts is a matter in respect to which both it and the plaintiff have some obligation, and has apparently been seeking a basis of equitable adjustment.

[1, 2] At the threshold we are confronted with the question whether or not the case should be deemed to be a suit against the state, and for that reason withdrawn from our jurisdiction by the Eleventh Amendment to the federal Constitution. The precise question was submitted upon a motion to dismiss the bill, but the view was then taken that, while our jurisdiction is so restricted by this constitutional provision that at most we could grant but a little relief, some of the averments of misconduct are so unqualified and sweeping as necessarily to imply arbitrary, if not wanton, inaction on the part of the defendants, and, if true, would warrant a small measure of relief. Akin to this question of the jurisdiction of federal courts is the broader question of the jurisdiction of any court of equity to grant the relief prayed for; indeed, so closely related are the two questions that no attempt is made in the discussion which follows to distinguish or state separately the considerations which apply to one and not to the other. By reason of the peculiar nature of a Carey Act project and the anomalous relation thereto of the state land board, the federal question is not free from great difficulty, and upon it the decided cases defining the scope of the constitutional provision throw no very certain light. A measure of assistance may be gathered from the following cases: State v. Twin Falls Salmon R. L. & W. Co., 30 Idaho, 41, 166 Pac. 220, opinion on rehearing, page 232; Davis v. Gray, 83 U. S. (16 Wall.) 203, 21 L. Ed. 447; Board v. McComb, 92 U. S. 531, 23 L. Ed. 623; Louisiana v. Jumel, 107 U. S. 711, 2 Sup. Ct. 128, 27 L. Ed. 448; Hagood v. Southern, 117 U. S. 52, 6 Sup. Ct. 608, 29 L. Ed. 805; Rolston v. Crittenden, 120 U. S. 390, 7 Sup. Ct. 599, 30 L. Ed. 721; In re Ayers, 123 U. S. 443, 8 Sup. Ct. 164, 31 L. Ed. 216; Hans v. Louisiana, 134 U. S. 1, 10 Sup. Ct. 504, 33 L. Ed. 842; Pennoyer v. McConnaughy, 140 U. S. 1, 11 Sup. Ct. 699, 35 L. Ed. 363; Reagan v. Farmers' L. & T. Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014; Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764; Scully v. Bird, 209 U. S. 481, 28 Sup. Ct. 597, 52 L. Ed. 899; Lankford v. Platte Iron Works, 235 U. S. 461, 35 Sup. Ct. 173, 59 L. Ed. 316; Tanner v. Little, 240 U. S. 369, 36 Sup. Ct. 379, 60 L. Ed. 691; Carolina Glass Co. v. Murray, 240 U. S. 305, 36 Sup. Ct. 293, 60 L. Ed. 658; Johnson v. Lankford, 245 U. S. 541, 38 Sup. Ct. 203, 62 L. Ed. 460; Martin v. Lankford, 245 U. S. 547, 38 Sup. Ct. 205, 62 L. Ed. 464; Morenci Copper Co. v. Freer (C. C.) 127 Fed. 199; Magruder v. Belle Fourche, etc., 219 Fed. 72, 135 C. C. A. 524; Weiland v. Pioneer Irr. Co., 238 Fed. 519, 151 C. C. A. 455.

Now, bearing in mind the constitutional provision and the general principle that the jurisdiction of courts of equity cannot be invoked to interfere with administrative officers, while exercising a discretion with which they are clothed by law, we pass to consider the specific contention made by the plaintiff.

First, the supplemental bill: It appears that in the fall of 1917, after a joint investigation by the defendants and a representative of the General Land Office, the Commissioner of the General Land Office, having found that there was water available for only 35,000 acres,

recommended to the land board that the project be contracted to that area, and the defendants, concurring in this view, passed a resolution in harmony therewith, and formally entered an order that the application for patent should cover only an area which, when added to the lands already patented and state lands already sold and desert entries remaining in the project, would amount to 35,000 acres. As to the future disposition in the Land Office of the residue of the 60,000 acres covered by outstanding contracts no affirmative action has been taken, so far as the record discloses. True, in the answer defendants admit that they propose to relinquish some of the lands covered by contracts, but it nowhere appears when or under what conditions. They deny that they are now selecting or preparing to relinquish such lands, and it is not shown that they purpose taking any action to that end without giving plaintiff an opportunity to be heard and to protect such interest as it may have. There is no room for the contention that in entering the order the defendants acted wantonly or arbitrarily, or with an intent to do the plaintiff wrong, nor is there any suggestion that, if the project is to be contracted, a better or more equitable plan can be devised than that recommended by the commissioner or than that which the board·may adopt. Such is not the nature of plaintiff's complaint. Its opposition apparently rests exclusively upon the assumption that it is the legal duty of the board to apply for, and of the Secretary of the Interior to issue, patent for the 60,000 acres, not because there is water enough to irrigate that area, but because the lands were included in the project with the assent of both the state and federal authorities, and because, further, the plaintiff has contracted with entrymen to furnish water therefor.

The contention that the General Land Office is bound to issue patent for unreclaimed and irreclaimable desert lands, merely because, upon the ex parte representations of the promoters of the project and the state engineer and the state land board, such lands have been segregated for the purpose of reclamation, is thought to be wholly devoid of merit. It would be quite as reasonable to hold that when, under the terms of the Desert Land Act, the Land Office accepts the citizen's application to enter desert lands, the government is estopped from requiring as a condition precedent to the issuance of patent proof that the entryman is possessed of a water right sufficient in fact for the irrigation and reclamation of the land, merely because, under the regulations, there is attached to the application a map showing the source of the water supply and the proposed plan of irrigation. The primary purpose of the Carey Act was, not to enable the government to divest itself of title to its desert lands, but to secure their irrigation and reclamation; reclamation is the only consideration for the donation or grant, and is a condition precedent to the exercise of the power to grant. The authority conferred upon the Secretary of the Interior to convey is expressly limited to desert lands, which the state shall have caused to be—

"irrigated, reclaimed, occupied, and not less than twenty acres of each hundred and sixty acre tract cultivated by actual settlers * * * as thoroughly as is required of citizens who may enter under the [said] desert land law."

The act prescribes a procedure (similar to that required in the case of a desert land entry) for the temporary withdrawal of the lands from private entry, but the preliminary approval of the project by the Secretary in no wise imposes upon him or implies an obligation to patent. The only purpose of the preliminary showing is to inform him whether the plan is of sufficient apparent merit to warrant a temporary withdrawal of the lands from other forms of entry. Under the act as it originally stood, the Secretary was authorized to issue patents to the state or its assigns for such lands only as were shown by proof to have been actually irrigated, reclaimed, and settled. Act August 18, 1894, 28 Stat. 372, 422. By the amendment of June 11, 1896, it is true, the rigor of this requirement was in a measure relaxed; but under the new provision patent was authorized only for land for the reclamation of which "an ample supply of water is actually furnished in a substantial ditch or canal, or by artesian wells or reservoirs"; settlement and cultivation no longer being required. By the same amendment liens were "authorized to be created by the state * * * and by no other authority whatever," and when created they were declared to be valid "on and against the separate legal subdivisions of land reclaimed for the actual cost of reclamation," etc. Under these provisions, clearly liens attach only to reclaimed land, and patents may issue only for such lands as have been provided with an ample supply of water.

"The existence of this lien depends primarily upon the completion of the construction works and the delivery of water through the works by the construction company, as stipulated in its contracts with both the state and the entryman." Adams v. Twin Falls Oakley Land & Water Co., 29 Idaho, 371, 161 Pac. 325.

Again, by the amendment of March 3, 1901 (31 Stat. 1133, 1188), it is provided that, if the state fails within ten years after segregation to cause the whole or any part of the segregated tract to be irrigated and reclaimed, the Secretary may, in his discretion, extend the time for a period of not exceeding five years, or restore such reclaimed land to the public domain. The contract prescribed by the Interior Department, and presumably entered into in this case between the Secretary of the Interior and the state, is in strict accord with these requirements, and binds the Secretary to issue patents only when "an ample supply of water is actually furnished" for the tract for which patent is sought. It must be manifest, therefore, that the land board here could not hope to succeed in an application for a patent for the 60,000 acres without representing that an ample supply of water has actually been furnished for that area, and if the view they entertain of the facts is correct such a representation would be false and fraudulent. The plaintiff's interest in the land consists of the liens it claims to hold upon the several tracts to cover the purchase price of water rights which it has sold. But the authority of the state, and hence the plaintiff's authority to create a lien, is expressly limited to "reclaimed" lands. In the absence of such a restriction the government might, by the simple process of creating such liens upon desert lands and foreclosing them, be divested of the title to large tracts of the public do-

main, without any assurance of reclamation or of other reciprocal benefit.

What ground for complaint, then, has the plaintiff touching the proposed action of the state land board? If it has a lien only for the aggregate acreage for which it has supplied ample water, and if, as is apparently admitted, it can suggest no better plan for contracting the project than that adopted by the board, there remains only the question whether the board is in error in assuming that the water supply is adequate for only 35,000 acres. But, as already suggested, the plaintiff does not here tender an issue upon that point, and besides, in so far as it is involved in the patent proceedings, it is a question which is exclusively for the United States Land Department and not for the courts. Twin Falls Salmon River Land & Water Co. v. Caldwell, 242 Fed. 177, 155 C. C. A. 17. If the plaintiff believes that it can show a larger acreage entitled to patent, it should seek to intervene in the Land Office and make its showing. There is no suggestion that it has sought such privilege and been refused. The defendants, apparently acting in good faith, made the application for as large an acreage as they thought the facts warrant, and there is no reason to assume that they would object to the intervention, or that leave would be withheld by the Land Office.

In view of these considerations, I am inclined to think that the supplemental bill is not only without equity, but that the relief sought by it is within the inhibition of the Eleventh Amendment to the federal Constitution. Perhaps to avoid the possibility of misunderstanding it should be expressly stated that in reaching this conclusion I do not pass upon the question of the power of the state board or of the Secretary of the Interior, over the objection of settlers upon the excluded lands, to reduce the area of the project in the manner proposed. To such an issue the settlers would be indispensable parties. I hold only that upon the record here the plaintiff is not in a position to complain. Suppose that all the excluded settlers were to assent to the plan, what grievance would the plaintiff have? If, as we have determined, its lien is limited to the acreage for which it can furnish an ample supply of water, the proposed adjustment would be most favorable to it, for admittedly under no other plan could the available water be made to serve so large an area.

Turning now, to the original bill: While it is to be conceded that there have been great delays, the circumstances do not warrant the charge of arbitrary or willful inaction. It is to be noted that a majority of the defendants came into office in January, 1917, and, as I understand, the plaintiff does not contend that any applications it has made since that time have failed of reasonably prompt attention. Nor can it be held that the defendants have acted in any spirit of ill will toward the plaintiff, or have shown a disposition to disregard its rights. The outstanding fact of the whole business is that the shortage of water has given rise to problems seemingly insoluble. From proceedings taken in this court, and from published reports of proceedings had in the state courts, notice is taken of the fact that numerous questions have arisen of the most perplexing character, some of which, notwith-

standing long-continued litigation, still fail of final determination. One of the principal difficulties is that apparently there is no tribunal having complete and exclusive jurisdiction. Federal statutes interlace with state statutes. In some of its phases the controversy is for the state courts, in others for federal jurisdiction, and in still others it must be referred to the United States Land Department.

There are strong equities in favor of the settlers, and strong equities in favor of the holders of securities. Any plan to contract the irrigable area so that it will be commensurate with the actual water supply involves hardships to some of the settlers, and to any basis of classification serious objection may be raised. The improved tracts are scattered over the project, some of them isolated, with the result that, if only such lands are retained, the distribution of water will be attended with great loss from seepage and evaporation. If precedence be accorded the water contracts in the order in which they were negotiated, the holdings will be scattered, and some of the improved tracts excluded. If a comparatively compact body of land be retained, some of the first rights sold and some of the highly improved tracts must be abandoned. Besides, the extent of the irrigation service which may be reasonably expected from the system has not yet been authoritatively determined. And here again there is the question of a competent tribunal. Doubtless for certain purposes a court of competent jurisdiction may adjudicate the question, but will such an adjudication be binding upon the Land Department? That department must necessarily determine the question in disposing of patent applications, but is such determination binding upon the courts in the litigation of controversies not directly affecting title to the lands? Beset with the conflicting appeals of opposing interests, and confronted with such a maze of uncertainty, the board may very well have hesitated and deferred decisive action, with the hope that time would bring a solution.

The plaintiff complains of inconsistency on the part of the board, in that, while contending that the water supply was inadequate for outstanding contracts, it instituted legal proceedings in the state courts to compel the plaintiff to sell additional rights for state lands. But it was not improper for it to seek a judicial determination of the rights of the state, whose interests they as state officers were bound to protect. There were large tracts of state land in the project, which it had been agreed would receive water, and in view of the shortage of water the status of these lands involved, not only debatable, but extremely close, questions of law, and in presenting them to the Supreme Court of the state in appropriate proceedings the defendants were clearly in the line of official duty, although they at the same time believed and were taking the position that the contracts outstanding were greatly in excess of the water supply.

[3, 4] The charge that defendants are encouraging the settlers to violate their contract obligations rests upon an incident thought to be too trivial to require serious consideration. Apparently the plaintiff assumes (although its position in that respect is not clearly defined) that its rights are enlarged, or the power of the defendants is restrict-

ed, by reason of the fact that the state engineer, in approving the original proposal, reported that the sources of water supply were ample. There is an averment, supported by testimony, to the effect that, in undertaking the project plaintiff relied upon this report. The proposal signed by George F. Sprague and three others bears date August 12, 1907, the engineer's report was made upon the same day, as was also the order of the state land board accepting the proposal. Eight months later the contract in question was entered into between the state, acting through the land board, and the plaintiff. In it there is a recital to the effect that the plaintiff had succeeded to the rights of Sprague and his associates, which rights, it is stated, are evidenced by the proposal hereinbefore mentioned, together with the approval thereof by the land board on August 12, 1907; and the plaintiff agreed that it would perform the obligations of the accepted proposal.

To support the contention that it relied upon the state engineer's report it produces the deposition of one witness who in terms testifies that "full reliance was placed upon the report"; but manifestly such testimony is incompetent to establish the fact. While the witness had some relation (not clearly defined) to the promotion of the project, so far as appears he was never an officer or other representative of the plaintiff, and no corporate records or files were produced disclosing the action of the board of directors or their reasons therefor. How could he know the mental operations of the plaintiff's officers? Plainly in such testimony we have nothing more than the present personal opinion of the witness, the correctness of which, it may be added, is highly improbable. If for a moment we consider the magnitude of the proposed investment, and the fact that its return was necessarily conditioned upon the success of the enterprise, it would be a strain upon our credulity to believe that it was made upon the strength of a brief report of the state engineer in general terms to the effect that the project was feasible. But, if a contrary view were taken, could the fact that such report was relied upon avail the plaintiff anything in the present proceeding? If so, upon what theory of law and to what extent? It must be borne in mind that, under the Carey Act statutes of the state, neither the state nor its land board or engineer takes the initiative. The state does not make representations to promoters or capitalists to induce them to undertake a Carey Act project. The initiative is taken by the promoter, and the representations are made by and not to him.

In the instant case Sprague and his associates presented a written proposal to the land board, in which they represented that they had for some time been engaged in making surveys and estimates upon the project under consideration, and expressed their desire to "construct irrigation works which will cover and irrigate and render fit for farming and the growing of crops adapted to the climate" an area of approximately 150,000 acres. They requested the board to have the lands segregated from the public domain, and represented that if the application met with approval they would cause a corporation to be organized for the purpose of undertaking the work. As was their duty under the law, the land board referred the proposal to the

state engineer for his opinion.  The engineer's report is not required, and is not intended to be, for the benefit of the promoter, but for the information of the land board.  Sprague and his associates were not dependent upon the state engineer for information; they had been making their own surveys and their own estimates, and upon such investigation they first made representations as to the feasibility of the project.  Upon the acceptance of their proposal they became bound to carry out their offer; the proposal and the acceptance constituted the substance of a contract.  Before the formal contract was executed, they assigned their rights to the plaintiff, and as assignee it stands in their shoes.  It cannot claim any protection or advantage because of the existence of a report which was made to and for the benefit of the state board, and became functus officio upon the acceptance of the offer of Sprague and his associates.

[5] One other matter:  Independently of the controversies growing out of the shortage of water, plaintiff is entitled to have an authoritative determination of the question whether anything further is to be required of it in the nature of construction work.  Action in this respect has been deferred longer than was reasonably necessary, and additional delay may be greatly to the plaintiff's prejudice.  I would be inclined to grant a measure of relief upon this aspect of the case, but for the fact that apparently the plaintiff has made no serious effort during the term of office of the present land board to secure the desired action.  The last communication or application I find was in December, 1916, just before the termination of the term of the defendants' predecessors in office.  In fairness to the defendants, therefore, it cannot be held that they have willfully or unreasonably declined to act.  Perhaps it should be added that, in view of certain features of the record, the only relief which it would be practicable to grant would be to require the state board to take action upon the subject, without prescribing the precise nature of the action to be taken.  In its complaint the plaintiff expressly pleads that the system has not been fully completed according to specifications; but it further avers that, in view of the limited water supply, additional work would be useless, and would simply entail a waste of money.  From admissions made by counsel for defendants at the hearing it is to be concluded that such substantially are the facts.  It is therefore for the land board, and not for the courts in the first instance, to determine in just what particulars the contract work is unfinished, and to consider whether anything further will be required.  With the data at hand no reason is apparent why the matter could not be promptly disposed of.

Having in mind the great delays which have already intervened both before the land board and here, and taking notice that the defendants' term of office is about to expire, I have concluded to withhold the entry of a decree dismissing the bill in its entirety and to grant leave to plaintiff, after the expiration of 75 days from the date hereof, to take the necessary steps to have the defendants' successors in office substituted and to file a second supplemental bill, exhibiting the proceedings which it may have taken in the meantime to procure a determina-

tion of the status of the constructed work and the action or the inaction, as the case may be, of the land board in connection therewith. The time is limited to 75 days upon the assumption that the plaintiff will without delay present its application to the new board, and will furnish it with such reasonable data as it may desire. It will, of course, be understood that any action which the board may take in approving the constructed system and in waiving the performance of work which could serve no useful purpose shall in no wise affect the question of the sufficiency of the water supply or prejudice any existing right, claim, or defense which the land board or any interested party may have, in so far as the same is based upon or grows out of the inadequacy of the system in respect to water resources, and plaintiff's application should be so conditioned.

If the plaintiff desires an order or interlocutory decree in harmony with this suggestion, it should promptly prepare and present it for signature; otherwise, it should present a decree of dismissal.