McKINNEY v. BIG HORN BASIN DEVELOPMENT CO.

(Circuit Court of Appeals, Eighth Circuit. January 11, 1909.)

1. WATERS AND WATER COURSES (§ 222*)—DESERT LANDS—GRANT TO STATES FOR RECLAMATION—VALIDITY OF CONTRACT BY IRRIGATION COMPANY.

Act Aug. 18, 1894, c. 301, § 4, 28 Stat. 422, as amended by Act June 11, 1896, § 1, c. 420, 29 Stat. 413, and Act March 3, 1901, c. 853, § 3, 31 Stat. 1188 (U. S. Comp. St. 1901, pp. 1554, 1556, 1557), for the purpose of aiding the public land states in the reclamation of desert lands therein and the sale thereof to actual settlers in tracts not exceeding 160 acres each, authorized the Secretary of the Interior, upon proper application of a state, and the filing of a map and approved plan of irrigation, to contract with it to donate and patent to such state not exceeding 1,000,000 acres as the state shall cause the same to be irrigated, reclaimed, and occupied. The state is authorized to enter into contracts to cause the lands to be irrigated and induce their settlement, to provide for a lien thereon for the actual cost and necessary expense of irrigation, but is required to hold any surplus money derived from their sale, in excess of the cost of reclamation, as a trust fund, and apply the same to the reclamation of other desert lands therein. Rev. St. Wyo. 1899, § 934 et seq., provide for the acceptance of such grant, and vest the selection, management, and disposal of the lands in a State Board of Land Commissioners, and authorize the board to enter into contracts with any person or corporation proposing to reclaim lands, which contracts shall contain complete specifications of the proposed irrigation work, and its estimated cost, and the price and terms per acre at which such works with perpetual water rights shall be sold to settlers, with the price and terms on which the land will be sold by the state to settlers, "provided that such price and terms for irrigation works, water rights and for lands to be disposed of by the state to settlers shall in all cases be reasonable and just." They require the board immediately on the commencement of work by a contractor to give notice by publication in the county in which the land is situated that said land is open for settlement, the price at which it will be sold to settlers by the state, and the contract price at which settlers can purchase perpetual water rights. Held, that a contract made by a company which intended to, and afterward did, obtain a license from the board to construct irrigation works covering certain lands, by which it gave to a third person the exclusive right to make contracts with settlers on such lands on its behalf for perpetual water rights, at not less than $19 nor more than $30 per acre, in his discretion, and to give him all that was obtained above $19 per acre, was contrary to the intent of the law and to public policy, and would not be enforced in equity, since it not only violated the requirement of the law that the charge should in all cases

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

be just and reasonable, but made it impossible for the board to give the required notice of the price at which such water rights would be sold to settlers, and disenabled the company from performing the function contemplated by the grant from the state by contracting with settlers, leaving such function to be exercised arbitrarily by the other party to the contract.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 222.*]

2. CONTRACTS (§ 138*)—CONTRACT VOID AS AGAINST PUBLIC POLICY—RATIFICATION.

Such contract being void as against public policy, the company could not be estopped to deny its validity by permitting the other party to proceed thereunder.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 690; Dec. Dig. § 138.*]

3. EQUITY (§ 427*)—DECREE—NATURE AND EXTENT OF RELIEF.

While, under a general prayer for relief in a bill in equity, complainant may have any relief to which he shows himself entitled, it must be founded on and consistent with the facts set up in the bill, and with some theory of the case on which the bill was based.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 1009–1014; Dec. Dig. § 427.*]

4. SPECIFIC PERFORMANCE (§ 128*)—DECREE—NATURE OF RELIEF.

The complainant in a suit in equity to enforce specific performance of a void contract cannot recover on a quantum meruit for services performed thereunder, his right of action therefor, if any, being at law, where the parties are entitled to trial by jury.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 412, 415; Dec. Dig. § 128.*]

Appeal from the Circuit Court of the United States for the District of Wyoming.

On the 29th day of July, 1904, S. L. Wiley and F. C. Rutan, as parties of the first part, and George M. McKinney, the appellant, as party of the second part, entered into a written contract to the following effect, in so far as concerns the questions to be decided:

After reciting that the Big Horn Basin Development Company (a corporation created by the laws of the state of Wyoming) was about to enter into a contract with the state of Wyoming for the construction of certain irrigation works, whereby the state was about to grant to the company the right to charge not exceeding $30 per acre to settlers for water rights, etc., it stipulated that, upon the execution of said contract between the state and the company, the parties of the first part would use their best endeavors to cause a contract to be executed between the company and the party of the second part, whereby the company would grant to the complainant the exclusive privilege and authority of making contracts with settlers upon said lands to furnish water, it being understood that said contracts were to be approved by the company. The price at which said contracts might be made to settlers should be not less than $19 nor more than $30 per acre, and the compensation to be received by the complainant for his services should be an amount equal to the difference between the $19 per acre and the contract price per acre to said settler.

The contract then provides for payments by the settler in annual installments to the company, and for the manner of payment out of the same to the complainant.

It then directs that no contract shall be negotiated by the complainant except upon and until the lands upon which such contracts were to operate shall be selected and designated to the complainant by the company; provided, that the total amount of such lands shall be 250,000 acres, more or less, as may appear by the segregations thereof to the state, and shall be designated to the com-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

plainant in amounts of not less than 25,000 acres at any one time, the complainant agreeing that he would negotiate contracts upon at least 40,000 acres for each and every year after lands to that amount have been designated to him, the company reserving unto itself certain of said lands for town and mill sites and water-power purposes.

· It was then provided that, in case of failure by the complainant to negotiate contracts to the amount mentioned, for any one year, at the option of the company, this should operate as a forfeiture of all right of the complainant to further negotiate contracts; and in case any of said lands upon which contracts have been negotiated should revert or the settler lose his rights thereto, or the company should acquire the same, then the right to compensation thereon should cease, and the company, at its option, might permit or require the complainant to recontract said lands as an original contract, the complainant to be compensated therefor as if it were an original sale.

The bill avers that immediately after the delivery of said writing the defendant adopted the same as its agreement, and directed the complainant to set to work in procuring settlers to locate upon said lands, and to enter into contracts for water with which to irrigate the same. That in obedience to said directions the complainant, on or about the 1st day of August, 1904, began work under said contract, and thenceforth, until the happening of things thereinafter set forth, devoted his time to the performance of the promises therein mentioned; and that to that end he employed a large number of persons to assist him in the work, they to be compensated at the rate of $5 per acre in respect of all water contracts negotiated by them; that in the prosecution of his undertaking he made publication in various ways, and issued circulars to invite settlers to deal with him; and that "all of said things were done during the month of August, 1904, and were done at the request and by the direction of the defendant, and with the knowledge, consent, and approval of the defendant, its officers, directors, and stockholders."

It then appears from the allegations of the bill that the Board of Land Commissioners of the state did not enter into a contract with 'the defendant company until the 24th day of September, 1904, whereby the defendant undertook to construct the canal and reservoir in accordance with the plans referred to in the contract, by which contract the company was granted the exclusive right to procure qualified persons to settle upon and occupy the lands described therein, and to sell and dispose of water rights of the said irrigation system to said settlers at the price of not exceeding $30 per acre, the state agreeing to allow the entry of and payment for such lands to such settlers at the price of 50 cents per acre.

The bill then sets out that the complainant procured a large number of persons, say 350, qualified to make settlement on the lands, to make written application for contracts for the purchase of 50,000 acres of said lands and water rights, which were delivered to the defendant. That on the 31st day of March, 1905, the complainant had in progress negotiations with several hundred other persons qualified to make locations, and who were ready to enter into contracts therefor, when the defendant instructed him to desist from selling said lands and water rights, and informed him that when it was ready to resume the sale of its lands and water rights it would notify him. That he has from that time thenceforth been ready and willing to proceed with his undertaking under said contract, but that on the 1st day of April, 1906, the defendant informed him that it would not permit him to complete the performance of the contract, and has so continued to refuse; and that the defendant is and for some time past has been itself selling said lands and water rights.

The bill then proceeds to aver that by means of the matters aforesaid "the defendant adopted and assumed the said contract of July 29, 1904, in equity, and is in equity bound and obligated thereby as fully and completely as though said writing had been drawn up in the name of the defendant, and signed, sealed, and delivered to the complainant by it. And the complainant avers that by means of the premises he was and is in equity entitled to the exclusive privilege and authority of making contracts between the defendant and such settlers upon said lands in regard to the furnishing of water for said lands."

It is further asserted that the complainant is entitled to a decree confirming said contract, and to an injunction restraining the defendant from entering in-

to any contract with settlers upon said lands in regard to the furnishing of water, except such contracts as have been negotiated and shall be negotiated and made by the complainant in behalf of the defendant, so long as he shall sell annually the quantity of water rights required by his contract; and that the defendant be required to account to the complainant concerning all contracts for the furnishing of water for said lands made and entered into by the defendant, and for all moneys received by it in respect of such contracts, and to decree the payment of compensation to the complainant in respect of such contracts, at the rates and in the amounts specified in said contract of July 29, 1904; or, as an alternative, that the court make a decree establishing said contract of July 29, 1904, and that the defendant pay to the complainant all of his damages, past, present, and future, resulting from the abrogation and breach of said contract; and that defendant be required to pay to him the sum of $11 per acre for every acre of water rights so put under contract as aforesaid, amounting to the sum of $550,000, and damages for the breach of the contract at the rate of $6 per acre for each and every acre of said land so segregated as aforesaid over and above the said 50,000 acres.

To this bill the defendant demurred, on the ground that the complainant has not, by said bill, made or stated such a case as entitles him in a court of equity to any discovery or relief from or against the defendant touching the matters contained in the bill, or any such matters.

The Circuit Court sustained the demurrer, and the bill was dismissed, "without prejudice to the complainant's right to bring an action at law in such form as he may be advised."

From this decree the complainant has appealed to this court.

The acts of Congress under which the lands in question were ceded by the United States to the state of Wyoming are Act Aug. 18, 1894, c. 301, § 4, 28 Stat. 422 (U. S. Comp. St. 1901, p. 1554), Act June 11, 1896, c. 420, § 1, 29 Stat. 413 (U. S. Comp. St. 1901, p. 1556), and Act March 3, 1901, c. 853, § 3, 31 Stat. 1188 (U. S. Comp. St. 1901, p. 1557), which merely extends the time for reclamation by the state.

The substance of the congressional enactments is that, to aid the public land states in the reclamation of desert lands therein, and the settlement, cultivation, and sale thereof in small tracts to actual settlers, the Secretary of the Interior was authorized, upon proper application of a state, to contract with it to donate and patent to the state not exceeding 1,000,000 acres in each state, as the state may cause to be irrigated, reclaimed, and occupied, and not less than 20 acres of each 160-acre tract cultivated by actual settlers, within 10 years next after the passage of the act. Before the application of the state is allowed or any contract made or any segregation of any land from the public domain is ordered, the state was required to file a map of the lands proposed to be irrigated, with a plan showing the mode thereof, that it was sufficient to thoroughly irrigate and reclaim said land preparatory to the raising of ordinary agricultural crops, and also showing the source of the water supply to be used for irrigation. The states so contracting were authorized to make all necessary contracts to cause the lands to be reclaimed and to induce their settlement and cultivation, in accordance with and subject to the provisions of the act; the state being prohibited to lease any of said lands, or to use or dispose of them in any way, except to secure their reclamation, cultivation, and settlement. A lien is authorized by the state, and by no other authority, on and against the separate legal subdivisions of lands reclaimed, for the actual cost and necessary expenses of reclamation, and reasonable interest thereon. And when an ample supply of water is furnished to reclaim a particular tract or tracts, then patents should issue to the state for the same, without regard to settlement or cultivation.

Section 4 of the act of August 18, 1894, contained the following provision:

"As fast as any state may furnish satisfactory proof according to such rules and regulations as may be prescribed by the Secretary of the Interior, that any of said lands are irrigated, reclaimed and occupied by actual settlers, patents shall be issued to the state or its assigns for said lands so reclaimed and settled: Provided, that said states shall not sell or dispose of more than one hundred and sixty acres of said lands to any one person, and any surplus of money derived by any state from the sale of said lands in excess of

the cost of their reclamation, shall be held as a trust fund for and be applied to the reclamation of other desert lands in such state."

The Revised Statutes of Wyoming of 1899 pertinent to this question are as follows:

Section 934 accepts the conditions of section 4 of the act of Congress, together with the grants of land to the state under the provisions of the act.

Section 935 vests the selection, management, and disposal of said lands in the State Board of Land Commissioners, designated "The Board."

Section 940 provides that any person, association, or incorporated company constructing or having constructed ditches, canals, or other irrigation works to reclaim such lands shall file with the board a request for the selection on behalf of the state, by the board, of the lands sought to be reclaimed, which shall be accompanied by a proposal to construct the irrigation works necessary for the complete reclamation of the lands to be selected, the proposals to be prepared in accordance with the rules of the board and the regulations of the Department of the Interior; stating the source of the water supply, the location and dimensions of the proposed works, the estimated cost thereof, the price and terms per acre at which perpetual water rights will be sold to settlers, said perpetual rights to embrace a proportionate interest in the canal or other irrigation works, together with the rights and franchises attached thereto, etc.

Section 941 provides that the board shall have authority to prescribe that each proposal shall be accompanied by a certified check in an amount to be designated by the board, to be held as a guaranty of the execution of the contract with the state, etc.

Section 942 provides that such person or company making application shall file with the State Engineer application for a permit to appropriate water for purposes of reclamation of the lands described, to be accompanied by maps of the land selected, and the proposed irrigation works, to be prepared in accordance with the regulations prescribed by the State Engineer and the rules of the Department of the Interior.

Section 943 provides for the examination of the proposal by the chief clerk to see that it is in form, and for report by the engineer as to whether the proposed work is feasible, and that the canal or ditch can be supplied without undue diversion of the public waters of the state.

Section 944 directs where the matters aforesaid shall be filed in the local land office.

Section 946 declares that, upon the withdrawal of the land by the Department of the Interior, it shall be the duty of the board to enter into a contract with the parties submitting the proposal, and that such contracts shall contain complete specifications of the location, dimensions, character, and estimated cost of the proposed ditch, canal, or other irrigation work; the price and terms per acre at which such works and perpetual water rights shall be sold to settlers; the price and terms upon which the state will dispose of the lands to settlers: Provided, that such price and terms for irrigation works, water rights, and for lands to be disposed of by the State to settlers shall, in all cases, be reasonable and just.

Section 947 declares that no contract shall be made by the board which requires a greater time than five years for the construction of the works, and all contracts must state that the work shall be begun within six months from the date of the contract, etc.; and at least one-tenth of the construction work shall be completed within two years from the date of such contract, and the work shall be diligently and continuously prosecuted.

Section 948 deals with the matter of the failure of the parties having contracts to comply therewith within the prescribed time.

Section 950 provides that immediately upon the withdrawal of any land for the state by the Department of the Interior, and the inauguration of work by the contractor, it shall be the duty of the board, by publication in a newspaper published in the county in which the land is situated, for a given time, "to give notice that said land is open for settlement, the price for which said land will be sold to settlers by the state, and the contract price at which settlers can purchase perpetual water rights."

Section 951 prescribes the qualifications of such settlers, and requires that

the application of the settler must be accompanied by a certified copy of a contract for a perpetual water right, made and entered into by the party making application with the person, company, or association who has been authorized by the board to furnish water for the reclamation of said land; and the board shall thereupon file in its office the application and papers relating thereto, and, if allowed, issue a certificate of location to the applicant. All applications for entry shall be accompanied by a payment of 25 cents per acre as a partial payment on the land, conditional if the application is allowed, and if the application shall not be allowed the money to be returned to the applicant. The succeeding provisions deal with the work to be done by the settler and the issuing to him of a patent.

Section 956 gives to the person or company furnishing the water for any tract of land a first and prior lien on said water right and land for all deferred payments for said water right.

Charles C. Buell, Charles P. Abbey, T. Blake Kennedy, and Fred A. Dolph, for appellant.

John W. Lacey and Gibson Clark, for appellee.

Before HOOK and ADAMS, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge (after stating the facts as above). We pass by the suggestion that it might be inferred from the face of the bill that practically all the things done by the appellant were under his written contract with Wiley and Rutan prior to the acceptance by the board of the proposed contract from the appellee; that no written contract, in fact, was ever entered into between the appellant and the appellee, so that the liability of the latter, if any, depends solely upon acts in pais, from which an adoption of the contract sued on is to be inferred; as, in our judgment, the case is disposable upon other grounds quite incontestable.

The underlying purpose of the acts of Congress in ceding the vast domain of desert lands within the territorial limits of the given state was, through the agency of the state government more immediately concerned, to speedily have them reclaimed from an unproductive waste by means of artificial irrigation, whereby they might become susceptible of human sustentation, bringing population and wealth to the state. But Congress did not make the grant to the state of such lands in mass to take effect in præsenti. The state was first to furnish satisfactory evidence to the Secretary of the Interior that the lands are irrigated, reclaimed, and occupied by actual settlers before any patent therefor should issue. It also imposed the condition that the state should not accord to any one person over 160 acres of said lands. It limited the price of the land to the settler at 50 cents per acre. And to interdict the pernicious evil of speculation. even by the state itself, it provided that any surplus derived from such sales, in excess of the cost of their reclamation, should be held as a trust fund for and be applied to the reclamation of other desert lands in such State.

The state statute intrusted the selection, management, and disposal of the lands to a Board of Commissioners. While contemplating that persons, associations, and corporations might construct ditches and canals for irrigating the lands, they were, on prescribed conditions, to obtain license from the board. As a condition precedent thereto, they should file with the board maps of the lands to be reclaimed, and the

proposal should state the things prescribed by section 940 of the statute (Rev. St. 1899), among which is the estimated cost of the works, the price and terms per acre at which the perpetual water rights were to be sold to settlers on the lands to be reclaimed. As evidencing the state's policy and control over the whole matter, and the reservation of the right to protect the settlers induced to go upon the land, section 946 prescribed that it should be the duty of the board to enter into a contract with the party submitting the proposal, containing complete specifications of the location, dimensions, character, and estimated cost of the proposed ditch or irrigation work, and "the price and terms per acre at which such works and perpetual water rights shall be sold to settlers; the price and terms upon which the State will dispose of the lands to settlers;" with the proviso that such price and terms for irrigation works, water rights, and lands to be disposed of by the state to settlers shall, in all cases, be reasonable and just.

From all of which it is manifest that the scheme and policy of the statute was and is that the person or company contracting to furnish the water supply should make contract with the settler subject to the supervision and control of the Board of Commissioners, charged with the enforcement of the proviso that the water rates to the settler shall be reasonable. Whereas, the contract in question, which the appellant by this suit seeks to have specifically enforced, in its scope and essence, is an attempted evasion of the obligation of the contracting company to the state.

Section 950 of the statute requires that immediately upon the withdrawal of the land for the use of the state, and the inauguration of work by the contractor, the State Board shall give notice by publication, in the manner prescribed, "that said land is open for settlement, the price for which said land will be sold to settlers by the state, and the contract price at which settlers can purchase perpetual water rights." Evidently the statute contemplates that the board would obtain the necessary information of the contract price at which the settlers can purchase perpetual water rights from the contractor, and not otherwise. The bill of complaint alleges that immediately after the making of the contract between the appellant and Wiley and Rutan the appellee "adopted the same, * * * and directed the complainant to set to work at once to procure settlers." As this was nearly two months prior to the appellee entering into any contract with the board authorizing it to deal with the settlers, and as the bill alleges "that all of said things were done (i. e., the procuring of settlers and contracts) during the month of August, 1904," it is manifest that the appellant made contracts with settlers before the required publication of notice could have been lawfully made. And unless the contract in question was not only adopted by the appellee, but the written agreement in its terms was presented to the board for its acceptance and approval, as that of the contractor, no notice of its special terms could have been given by the board in conformity to the statute. And the bill does not in terms aver that this contract was submitted or made known to or accepted by the board, or that notice thereof was ever published by it; thus, clearly enough, again showing that in making this contract and

acting thereunder the appellant was proceeding in utter disregard of the prescriptions of the statute. By the contract in question the settlers were to be placed at his will. The bill avers on its face that the complainant "by means of the premises was and is in equity entitled to the exclusive privilege and authority of making contracts between the defendant and such settlers upon said lands in regard to the furnishing of water for said lands." He was to fix the price arbitrarily at which the settler could secure his complement of land with the water privileges, within the limit of $30 per acre. The contract arbitrarily fixed the cost to settlers at not less than $19 per acre, and complainant's compensation should come out of the excess over the $19 per acre; whereby, in any event, the appellee should receive $19 per acre, leaving the complainant $11 per acre for his services, if he could wring it from the settler. So the bill asserts a claim against the appellee for $11 per acre for the lands claimed to have been put under contract by him, amounting to the sum of $550,000, and damages for the breach of the contract at the rate of $6 per acre for each acre of land so segregated over the 50,000 acres. Can it be entertained for a moment that, had the State Board been advised, at the time the application for the contract with it was made, the appellee had such an arrangement with the complainant as disclosed in the bill, the company's application for a contract would have been accepted? The answer must be no, for the reason that the contract was in contravention of the declared legislative policy, in that it disregarded the obligation of the appellee to sell at not exceeding the reasonable cost, and also because it contemplated placing the settler at the will of the complainant as to the cost to be exacted from him.

The audaciousness of the contract which the court is asked to enforce is manifested in the prayer that the appellee be enjoined from making any contract with any settler at any price who may desire to enter upon the land and establish a home, and that the complainant, in effect, by decree of court be substituted as the contracting party with the state, as the sole authorized person to deal with and admit settlers on the lands, and on the terms of his alleged contract. The assertion of such a right flies in the face of a fundamental principle of law, that, where a grant of power under a statute is given for the accomplishment of the state's policy, the due performance of the function by the grantee is the consideration for the public grant; and consequently any contract by the grantee which tends to disable it from performing its entire function by undertaking to transfer to others the discharge thereof, with an effect, different from the grant, is violative of the contract with the state and contrary to public policy. York & Maryland Railroad Company v. Winans, 17 How. 30, 15 L. Ed. 27; Thomas v. Railroad Company, 101 U. S. 71–83, 25 L. Ed. 950. Every person dealing with such grantee of a privilege or right must take notice of the limitations placed thereon by the creative act.

It is no answer to this to say that after the original contractor, the appellee, had stood by and permitted the appellant to proceed to incur expenses and give his time and labor in execution of the contract, it should now be estopped to deny its accountability under the con-

tract. The answer to this is fully made by Mr. Justice Miller in Thomas v. Railroad Company, supra:

"It is a contract forbidden by public policy and beyond the power of the defendants to make. Having entered into the agreement, it was the duty of the company to rescind or abandon it at the earliest moment. This duty was independent of the clause in the contract which gave them the right to do it. Though they delayed its performance for several years, it was nevertheless a rightful act when it was done. Can this performance of a legal duty, a duty both to stockholders of the company and to the public, give to plaintiffs a right of action? Can they found such a right on an agreement void for want of corporate authority and forbidden by the policy of the law? To hold that they can, is, in our opinion, to hold that any act performed in executing a void contract makes all its parts valid, and that the more that is done under a contract forbidden by law, the stronger is the claim to its enforcement by the courts."

It is suggested that there is no legal incompatibility between the appellant's rights under the alleged contract and the exercise of the supervisory control of the State Board to see that the cost to the settler is reasonable. If this condition is to be regarded as written into the contract in suit, how can it be the subject of specific performance, which the suit, in legal effect, presents? Such a condition, if on the face of the contract, would disclose such an element of uncertainty as to render it incapable of being specifically enforced by decree of court. It would rest with neither party to say or concede what the reasonable cost would be, the standard to which appellant's compensation must be made to conform, as that ascertainment under the statute in the first instance devolved upon the managing board of the state, over whose action neither the appellant nor the appellee have any control. Moreover, the bill of complaint neither asks this court to determine whether or not the cost made to the settler by the complainant was reasonable, and, if it had, it furnishes no basis for its ascertainment and determination.

Nor can the complainant on this appeal be heard to say, as in the brief of counsel, that there is nothing in the contract which precludes the principal from selling direct to the settler. As already shown, the gravamen of the bill is that the defendant denied the complainant the exclusive right under the contract to make terms with settlers, and he prays, inter alia, for an injunction "restraining the defendant from entering into any contract or contracts with settlers upon said lands in regard to the furnishing of water for such settlers for said lands, except such contracts as have been negotiated and shall be negotiated and made for and in behalf of the defendant by the complainant." That was the question raised by the bill which the chancellor heard and passed on below, and it is the question the appeal seeks to have reviewed. While under the general prayer for relief a party may have any relief to which in equity he shows himself to be entitled, it is none the less limited to relief founded on and consistent with the facts set out in the bill. Nor is the party entitled to a decree on a finding of fact different from any theory of the case set up in the bill. Newham v. Kenton, 79 Mo., loc. cit. 385, 386; Reed v. Bott, 100 Mo., loc. cit. 66, 12 S. W. 347, 14 S. W. 1089; Harrison v. Nixon, 9 Pet., loc. cit.

503, 9 L. Ed. 201; Boone v. Chiles, 10 Pet., loc. cit. 209, 9 L. Ed. 388; Phelps v. Elliott (C. C.) 35 Fed., loc. cit. 461.

As a dernier ressort, counsel for the appellant suggest that at least he should be entitled to relief as for compensation for valuable services rendered by him which the appellee refuses to pay. There are two answers to this: First, no such case is presented by the bill, and no such relief is prayed for. A party may not in equity sue for one thing, and, failing in that, recover for another; and, second, if such action were the predicate of the bill, it would put the complainant out of a court of equity, as presenting the action of quantum meruit, fully cognizable at law, in which the parties would be entitled to trial by jury. This bill is predicated upon a specific, written contract, seeking its enforcement, which is of such a character as a court of equity will not countenance.

It results that the decree of the Circuit Court must be affirmed, and it is so ordered.