STATE OF IDAHO ex rel. Cecil D. ANDRUS, Governor, et al., Plaintiffs,

v.

Thomas S. KLEPPE, Secretary of the Interior, Defendant.

Civ. No. 1–75–22.

United States District Court,
D. Idaho.

July 15, 1976.

Wayne L. Kidwell, Atty. Gen., Nathan W. Higer, Dept. of Water Resources, Boise, Idaho, for plaintiffs.

Wilbur T. Nelson, Asst. U. S. Atty., Boise, Idaho, for defendant.

## MEMORANDUM DECISION AND ORDER

J. BLAINE ANDERSON, District Judge.

On August 18, 1894, the Carey Act was passed "granting," under certain conditions, one million acres of desert land to the State of Idaho, as well as other desert land states. 43 U.S.C.A. § 641. An additional two million acres were "granted" the State of Idaho in 1908. 35 Stat. 577 (May 25, 1908) and 35 Stat. 347, 43 U.S.C.A. § 645 (May 27, 1908). On February 21, 1975, the State of Idaho, ex rel. Cecil D. Andrus, Governor, R. Keith Higginson, Director of the Idaho Department of Water Resources, and the Idaho Water Resource Board filed suit against the United States Secretary of the Interior, alleging jurisdiction under the federal question jurisdictional statute, 28 U.S.C.A. § 1331 and under the Administrative Procedure Act, 5 U.S.C.A. § 701. On September 24, 1975, the Idaho Carey Act Development Association was granted leave to appear in this case as amicus curiae.

Both plaintiff and defendant have filed motions for summary judgment, supported by legal memoranda. The Idaho Carey Act Association has likewise filed memoranda. A hearing was held April 30, 1976, in which all issues before the Court were addressed. The case is submitted and the Court is fully advised in the premises and hereinafter renders its Memorandum Decision and Order incorporating its Findings of Fact and Conclusions of Law.[1]

On July 31, 1975, the Interior Board of Land Appeals rendered its decision affirming a denial of an application by the Idaho Department of Water Resources for a temporary withdrawal pursuant to 43 U.S.C.A. § 643. *Idaho Department of Water Resources*, 21 IBLA 210 (1975). The Board rejected the application on the ground that the lands applied for had previously been withdrawn for stock-driveway purposes.[2]

Plaintiff's first cause of action prays for judgment declaring that the State of Idaho has an absolute right to demand up to three million acres of desert lands under the Carey Act and further declaring that the defendant, through the Bureau of Land Management, has no authority or discretion to deny any request for segregation or withdrawal when presented by the plaintiff. The amicus plaintiffs contend there are two issues involved in plaintiff's first cause of action, namely: (1) whether the State of Idaho has the right under the Carey Act to request withdrawal or segregation of lands which have been previously withdrawn from the public domain or reclassified by action of the federal executive authority, and (2) whether the defendant has the right to withdraw lands from the purview and effect of the Carey Act *after* the State of Idaho has identified such lands as desert lands, selected them, and requested their segregation. *See, Wyoming v.*

1. There are no material issues of fact in dispute; rather, the parties have sought to clearly present issues of law to the Court. As such, it is appropriate to decide this case on the basis of cross-motions for summary judgment. Rule 56, F.R.Civ.P.

2. The Idaho Department of Water Resources had also applied for land previously withdrawn for reclamation purposes and for a National Wildlife Refuge. The Department, however, did not appeal the ruling with regard to land covered by such withdrawals; rather, the plaintiff has only attacked the ruling pertaining to stock-driveway withdrawals. It is noted, nonetheless, that plaintiff's argument addresses the nature of the grant and goes much farther than a mere attack on previous withdrawals for stock-driveway purposes. Plaintiff attacks any type of previous withdrawal, save one—a withdrawal for national security or defense.

*United States,* 255 U.S. 489, 41 S.Ct. 393, 65 L.Ed. 742 (1921). The plaintiff and amicus curiae have attempted to present a very broad issue to the Court; however, this Court can decide only actual cases and controversies.[3] To that end the second issue stated above and raised by the amicus curiae is not properly before the Court. While the amicus curiae contend there are instances where Carey Act requests have been denied on the basis of prior and subsequent withdrawals, nevertheless, the only final agency action before the Court, as correctly pointed out by the United States, is the decision in *Idaho Department of Water Resources, supra.* 5 U.S.C.A. § 704.

## I.

■■■ The issue, therefore, is whether the defendant, Secretary of the Interior, through his representative, has discretion and authority to deny a State request for temporary withdrawal of desert lands on the ground that the lands were previously withdrawn for stock-driveway purposes. Resolution of the issue necessarily entails examining the nature of the grant to the States under the Carey Act. In construing a statute, the goal, of course, is to determine the legislative intent. Initially, the first inquiry must be the wording itself. The Carey Act states in relevant part:

"To aid the public-land States in the reclamation of the desert lands therein, and the settlement, cultivation and sale thereof in small tracts to actual settlers, the Secretary of the Interior with the approval of the President is, as of August 18, 1894, *authorized and empowered, upon proper application* of the State *to contract and agree,* from time to time, with each of the States in which there may be situated desert lands . . . , *binding the United States to donate, grant and patent* to the State free of cost for survey or price such desert lands, not exceeding one million acres in each State, as the State may cause to be irrigated, reclaimed, occupied, and not less than twenty acres of each one hundred and sixty acre tract cultivated by actual settlers, as thoroughly as is required of citizens who may enter under the said desert-land law, within ten years from the date of approval by the Secretary of the Interior of the State's application for the segregation of such lands; . . .

". . . and the Secretary of the Interior may make necessary regulations for the reservation of the lands applied for by the States to date from the date of the filing of the map and plan of irrigation, but such reservation shall be of no force whatever if such map and plan of irrigation shall not be approved.

"Any State *contracting* under this section is hereby authorized to make all necessary contracts to cause the said lands to be reclaimed, and to induce their settlement and cultivation in accordance with and subject to the provisions of this section; . . .

"As fast as any State may furnish satisfactory proof according to such rules and regulations as may be prescribed by the Secretary of the Interior, that any of said lands are irrigated, reclaimed and occupied by actual settlers, patents shall be

---

**3.** The controversy must be one that is appropriate for judicial determination, it must be definite and concrete, touching the legal relation of the parties having adverse legal interests, and it must be real and substantial, admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. *Aetna Life Insurance Co. v. Haworth,* 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937). A declaration of rights as they stand must be sought, not on rights which may arise in the future and there must be an actual controversy over an issue, not a desire for an abstract declaration of law. *Re Summers,* 325 U.S. 561, 65 S.Ct. 1307, 89 L.Ed. 1795 (1945). There is no actual case or controversy before this Court with respect to denials of Carey Act applications on the ground of subsequent withdrawal or reclassification. The factual matters involved in such denials by the Secretary of the Interior or the reasoning employed to reach the result are not known. Further, even if this Court could hold there was such a case before it, the issue does not arise in a proper framework, since it does not appear that administrative remedies have been exhausted. 5 U.S.C.A. § 704. *See, Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938).

issued to the State or its assigns for said lands so reclaimed and settled: . . ." (Emphasis added)

The wording of the statute seems quite clear and it is readily apparent that an *in praesenti* grant was not made to the States. Rather, the Act confers upon the States a right to contract with the United States under certain prescribed conditions in order to receive patents for acreages of the public domain. The purpose of the Act, as stated in the first paragraph, is to aid public-land States in the reclamation of the desert lands therein, and the settlement, cultivation and sale thereof in small tracts. The same paragraph speaks in terms of binding the United States to donate, grant and patent to the State. However, the so-called binding donation is preceded and modified by language which authorizes and empowers the Secretary of the Interior, upon proper application of the State, to contract and agree, from time to time, and approve applications for segregation. The power to contract is the power to bind the United States to donate and patent in accordance with a contract, where the conditions of such contract have been fulfilled.

The Supreme Court, in *Idaho Irrigation Co. v. Gooding*, 265 U.S. 518, 44 S.Ct. 618, 68 L.Ed. 1157 (1924) (dicta) spoke of the grant as follows:

> "By the Carey Act the United States binds itself to donate, grant and patent to a state, complying with stated conditions, desert lands, which the state may cause to be irrigated, reclaimed, and occupied. The state is required to file a map of the land proposed to be irrigated, showing the plan of irrigation, etc., and is authorized to make contracts to cause the lands to be reclaimed, and to induce their settlement and cultivation. *Upon satisfactory proof the Secretary of the Interior is directed to issue patents to the state or its assigns.*" 265 U.S. at 521, 44 S.Ct. at 619. (emphasis added)

4. The language addressing other forms of entry, while dicta, indicates Judge Dietrich's view that the Secretary of the Interior does indeed have the discretion to deny a request for tem-

In *Twin Falls Salmon River Land & Water Co. v. Alexander*, 260 F. 270 (D.C.Idaho 1919), *affirmed*, 267 F. 382 (9th Cir. 1920), Judge Dietrich, speaking for this Court, in dicta stated:

> "The primary purpose of the Carey Act was, not to enable the government to divest itself of title to its desert lands, but to secure their irrigation and reclamation; reclamation is the only consideration for the donation or grant, and *is a condition precedent to the exercise of the power to grant.* The authority conferred upon the Secretary of the Interior to convey is expressly limited to desert lands, which the state shall have caused to be—
>
> 'irrigated, reclaimed, occupied, and not less than twenty acres of each hundred and sixty acre tract cultivated by actual settlers . . . as thoroughly as is required of citizens who may enter under the [said] desert land law.'
>
> The Act prescribes a procedure (similar to that required in the case of a desert land entry) for the temporary withdrawal of the lands from private entry, but the preliminary approval of the project by the *Secretary in no wise imposes upon him or implies an obligation to patent. The only purpose of the preliminary showing is to inform him whether the plan is of sufficient apparent merit to warrant a temporary withdrawal of the lands from other forms of entry.*" 260 F. at 274–275.[4] (Emphasis added)

The Eighth Circuit Court of Appeals in *McKinney v. Big Horn Basin Development Co.*, 167 F. 770 (8th Cir. 1909) also addressed the nature of the grant as follows:

> "The underlying purpose of the acts of Congress in ceding the vast domain of desert lands within the territorial limits of the given state was, through the agency of the state government more immediately concerned, to speedily have them reclaimed from an unproductive waste by

porary withdrawal where the land is best withdrawn for other types of uses, and withdrawals therefor.

means of artificial irrigation, whereby they might become susceptible of human sustentation, bringing population and wealth to the state. *But Congress did not make the grant to the state of such lands in mass to take effect in praesenti.* The state was first to furnish satisfactory evidence to the Secretary of the Interior that the lands are irrigated, reclaimed, and occupied by actual settlers before any patent therefor should issue. It also imposed the condition that the state should not accord to any one person over 160 acres of said lands." 167 F. at 775. (Emphasis added)

■ The language in *McKinney v. Big Horn Basin Development Co.* and *Twin Falls Salmon River & Water Co. v. Alexander* reflect a view consistent with the language of the Act and can be read to state that an outright grant did not occur under the Carey Act.[5]

The legislative history of debate on the Carey Act reflects a position by the representatives that it was not to be an absolute gift as occurred under the Swamp Land Act of 1850. *United States v. Louisiana*, 127 U.S. 182, 8 S.Ct. 1047, 32 L.Ed. 66 (1888). A letter from S. W. Lamoreux, Commissioner, Office of the Secretary of the Interior, was introduced in the House and indicates the type of grant anticipated under the Carey Act. The letter, in part, states:

"The people of the States in which the arid lands are located would like to see the United States undertake their reclamation. This is certainly impracticable now, and it is doubtful whether it will ever be otherwise. There are those who think that the arid lands should be given to the States under certain restrictions. Public sentiment would scarcely justify such legislation at this time. The experience of the United States and the several

States under the swamp-land acts does not argue in favor of such disposal of the arid lands . . . ."

\* \* \* \* \* \*

"The principal proposition involved, reclamation and settlement by individuals in small holdings, meets my strong approval, and this bill seems to me to present full opportunity for the practical experiment and under proper safeguards. The United States retains title until reclamation is accomplished and the land occupied by actual settlers. This, if successful, is the great object to be attained; and if unsuccessful the United States still holds the unincumbered fee." 26 Cong. Rec. 8390 (1894).

The following passages from the Congressional Record amplify the nature of the grant from the viewpoints of a supporter of the House bill, as well as opponents of the same:

"Mr. PICKLER. . . . The proposition that is now before the House is one that has been approved by the Commissioner of the General Land Office and I think there can be no objection to it. Gentlemen will remember how sensitive this House has shown itself from time to time in regard to making direct appropriations for the irrigation and reclamation of arid lands. Now, here is a proposition which costs the Government nothing, but simply donates these lands to the States, leaving them to bear the burden of irrigation and reclamation of arid lands. Furthermore, it is provided that the title to these lands shall not pass to the States until it is shown to the satisfaction of the Secretary of the Interior that the lands have been reclaimed according to law and the money expended upon them." 26 Cong.Rec. 8391.

\* \* \* \* \* \*

---

5. The language quoted from the above cases is dicta and for that reason is not controlling. Notwithstanding the over-broad language in *Idaho Irrigation Co. v. Gooding*, an *in praesenti* grant of title did not occur under the Carey Act; rather, in 1894, as this opinion further develops, the States were given a right of entitlement to contract with the Secretary of the

Interior for one million acres of desert land suitable for irrigation, cultivation and settlement. The cases cited, however, do offer some insight with regard to the nature of the grant, and the thoughts expressed by Judge Dietrich in *Twin Falls Salmon River Land & Water Co. v. Alexander* are in accord with the language of the Act itself and the legislative history.

"Mr. McRAE. Mr. Speaker, as I have already stated, I do not approve of legislating in this way. . . .

"At the suggestion of the conferees on the part of the House, this substitute for the Senate proposition was prepared, because they were not satisfied with that of the Senate. If anything is to be done at this time it should be carefully guarded so as to protect the United States against fraud in the proof of reclamation.

"Now, Mr. Speaker, I want to state briefly what I understand to be the main difference between the two propositions. The Senate proposition makes a reservation outright for the States and will make it possible for the States to put a million of acres in each State in reservation for an indefinite period. It leaves the question of irrigation to be determined under rules and regulations to be made by the States themselves. In short, the States will decide whether they have complied with the conditions as to irrigation. The pending proposition does not make any grant, but only authorizes the Secretary of the Interior with the approval of the President to make a contract with any States in which any of these lands may be situated for the reclamation of not exceeding a million acres in each State, the question of irrigation to be finally determined by the Executive officers of this Government. No reservation or withdrawal is permitted except for temporary purposes until the plan is approved; and no title is to pass until thorough irrigation is accomplished and shown to the satisfaction of the Interior Department." Id.

* * * * * *

"Mr. McRAE. If this substitute be adopted it will only authorize contracts which will lapse in ten years after their date. It is not a legislative grant; it does not require any action of Congress for its forfeiture. It does not even put the land in a state of reservation until a map is filed and the plan of irrigation is approved." Id.

* * * * * *

"Mr. CANNON of Illinois. Mr. Speaker, it is with very much diffidence that I take the floor to say anything about the Senate Amendment or the proposed substitute to this bill. . . . I want to express a doubt, however, about the wisdom of legislation of this kind upon the sundry civil or any other appropriation bill.

* * * * * *

"But I very much doubt whether the proposed provision will bear good fruit. I recollect—I do not recollect, but all of us know—that in 1850 there was a grant of swamp land to the various States—Minnesota, Illinois, Arkansas, and all of the States that had public lands of that character. The question presented then was to get rid of the water in certain sections. This is a proposition to supply the water in certain other sections.

"Now, I must say that the operations of the swamp-land grant act was not satisfactory. Great lots of land were selected, for instance, in my own State of Illinois, the most valuable agricultural lands we have now, and great claims of indemnity are still pending in some of the States, so that that appropriation of land in the main was worse than wasted—not properly considered, not properly guarded." Id. at 8392.

* * * * * *

"Mr. PICKLER. Mr. Speaker, I desire to say, in reply to the gentleman from Illinois, that for probably ten or twelve years this matter of irrigation in the arid regions has been before Congress, has been discussed, has been talked about, and we have so far failed to get any legislation in regard to the matter—an utter failure in any legislation. Now, this subject is well understood by the House of Representatives. Everybody knows that the land is lying out there. They know that it is useless; and everybody desires it reclaimed. It is a very simple proposition; and the answer to the objection of the gentleman from Illinois is this: that where this differs from the

swamp-land grants is that the Government does not grant this at all. The government only grants it and the State only receives title to it after it has made its proof that the land is reclaimed. So this does not pass to the States as the swamp land passed to the States." Id.

"Mr. VAN VOORHIS of New York. If the States should disregard the restrictions, is there any remedy?

"Mr. NEWLANDS. I presume there is.

"Mr. PICKLER. This amendment provides that the lands shall not be ceded to the States until they have complied with the regulations prescribed by the Secretary of the Interior." Id. at 8427.

"Mr. McRAE. . . . The Senate amendment is in my judgment extremely dangerous, and should not be adopted. "On yesterday I pointed out some of the objections to it, but since the gentleman from South Dakota has abandoned it and is satisfied to adopt the substitute which I offered, it is not now necessary to discuss it further. I would prefer to see no legislation at this time and in this way, but if the question can not be postponed for a more careful consideration then we should proceed with all the caution and care that is possible under the circumstances, for the legislation is important and far reaching. The amendment does not appear to be understood by some who have opposed it. It has been likened to the swamp-land grant of September 28, 1850.

"That was a grant *in praesenti* and passed the title as of the date of the grant. This is no grant at all, but only gives authority to the Secretary of the Interior and President to make contracts binding the United States to donate the land to the States when reclaimed. That act passed the title to the whole of the swamp and overflowed lands which were unfit for cultivation and unsold at that time to the States. This grants nothing and authorizes no conveyance until reclamation.

"There was no limit to the swamp land grant as to the area to be taken or the time when it should be selected. Under this bill the area to each State is limited to 1,000,000 acres and the time for reclamation ten years after contract. Under the swamp land grant the States were left free to dispose of the lands before reclamation and without any limitation as to the quantity that could be sold to one person. Under this amendment the States must reclaim the land before they get it and must provide for its settlement and occupancy by bona fide settlers, and can not sell exceeding 160 acres to any one person." Id. at 8431.

While the policy underlying a legislative enactment normally need not be considered when the meaning of the act is clear, nevertheless, it does offer insight into the legislative intent. The Carey Act represents a deliberate policy change in contradistinction to the outright grants of the swamp land acts and entrusted the Secretary of the Interior with broad discretion through his power to contract with the States.

■ Administrative interpretation of a statute is an important construction aid to identify the legislative intent and is entitled to considerable weight where the administrative interpretation is close in time to the passage of the Act, and has endured the passage of time. *Sunray Mid-Continent Oil Co. v. F. P. C.*, 364 U.S. 137, 80 S.Ct. 1392, 4 L.Ed.2d 1623 (1960). The Department of the Interior held the view in 1908 that the Carey Act was not an *in praesenti* grant, but rather invested the Secretary of the Interior with discretion to contract with the end in mind of patenting acreage to the States.

"It is clear from the terms of the act of August 18, 1894, *supra*, under which the application of the State is filed, that the acceptance of the offer of the State is a matter wholly within the discretion of the Department. The filing of the application is preliminary to the formation of a contract between the State and the United States. It is manifest that the formation of such contract depends upon the acquiescence of both parties thereto without a right in either to insist upon a

proffer or acceptance by the other. It is equally clear that when the lands made the subject-matter of the proposed contract have been set aside for other purposes, the Secretary of the Interior, as the authorized representative of the Government in such matters, is fully warranted in declining to enter into any contract with the State which would defeat the object for which the lands were set aside. The State has no right to insist that he should. As his discretion is not subject to control by the State, a hearing for the purpose of determining whether or not that discretion has been properly exercised can not be demanded by the State. So long as a withdrawal made by him under authority of law remains unrevoked the presumption so far as third persons having no interest in the land withdrawn are concerned, that his discretion was properly exercised is conclusive, and so long as such withdrawal remains in force the land covered thereby is not subject to any claim of the State under the Carey Act." *State of Wyoming,* 36 L.D. 399–400 (1908).

██ That an *in praesenti* grant of title did not occur under the Carey Act seems quite clear from the language of the Act, the legislative history, administrative interpretations, and court interpretations, albeit dicta. It is likewise clear, however, that the Carey Act and subsequent enactments conferred upon the State of Idaho a right of entitlement to three million acres of desert land suitable for irrigation, cultivation and settlement. The State is guaranteed a maximum entitlement of three million acres of suitable desert land for Carey Act development to select from time to time, which it cannot be deprived of by the Secretary of Interior, if the State meets the conditions of the Carey Act. However, the State may not perfunctorily select acreage previously withdrawn for other purposes such as in this case a withdrawal for stock-driveways. The Secretary is under an obligation to preserve enough desert land suitable for Carey Act development to fulfill the State's right of entitlement, which the Federal Government must contract to donate to the

State in accordance with the Act. To the extent the land has been withdrawn for other purposes by the Secretary and the State remains desirous of initiating a Carey Act development on such acreage, its remedy is to petition the Secretary to reclassify the lands suitable for Carey Act entry. The Secretary may not arbitrarily deny the State's application for reclassification, withdrawal and Carey Act segregation. The Secretary's ruling, once final, is reviewable under the standards set forth in *Bronken v. Morton,* 473 F.2d 790 (9th Cir. 1973), *cert. denied,* 414 U.S. 828, 94 S.Ct. 51, 38 L.Ed.2d 62 (1973), *Richardson v. Udall,* 253 F.Supp. 72 (D.C.Idaho 1966), and the Administrative Procedure Act, 5 U.S.C.A. § 706. Such a construction of the Carey Act is consistent with 43 U.S.C.A. § 315f and its proviso empowering and directing the Secretary to classify the public lands as more valuable or suitable for certain purposes upon application by a qualified applicant. *See, Bleamaster v. Morton,* 448 F.2d 1289 (9th Cir. 1971). The Court does not accept the State's argument that it is absolutely entitled to select *any* land on the public domain for Carey Act development, for such a construction does not comport with the wording of the Act, its legislative history, other acts of Congress regarding the public domain, as well as the broad discretion invested in the Secretary of Interior as manager of the public domain.

## II.

The second issue before the Court is whether a husband and wife may make adjoining entries of 160 acres each under the Carey Act and whether a residence constructed on the dividing line between the two entries satisfies the settlement requirement of the Act.

In 1974 the Idaho Legislature amended the State's Carey Act in pertinent part as follows:

"For the purpose of any drawing and/or selection of land for entry under this section or section 42–2013A, Idaho Code, a husband and wife shall be allowed to

join their entries and receive a total of three hundred twenty (320) acres in one drawing or selection." 42 Idaho Code § 2013 (1974).

Relevant language of the Carey Act provides:

"As fast as any State may furnish satisfactory proof . . . that any of said lands are irrigated, reclaimed and occupied by actual settlers, patent shall be issued to the State . . . : *Provided,* That said States shall not sell or dispose of more than one hundred and sixty acres of said lands to any one person . . . " 43 U.S.C.A. § 641.

On August 29, 1974, the Deputy Solicitor to the Director of the Bureau of Land Management issued an opinion which the United States represents is the final agency position on the matter.

■ In concluding that Section 2013, Idaho Code, Title 42, is at odds with the legislative purpose and Department of Interior precedent, the Solicitor states that it is not possible for both a husband and wife who are not separated to qualify for 160 acres each since it is presumed that they will share the same residence and this mutual residence can only be located on one 160-acre tract. The underlying reasoning of the Solicitor's opinion is that from the overall context of the Act, the phrase "any one person" in the proviso means "actual settler," as the latter phrase is used to modify the phrase "any one person." Based on Department of the Interior precedent, the term "actual settler" has an established meaning of "actual resident." Further, the Solicitor reasons that "actual resident" means that a family is entitled to only one 160-acre tract. The Court has no difficulty accepting the Solicitor's first step, namely, that an actual settler is a person who goes upon the land with the intent of making it his home. *United States v. Atterbury,* 10 L.D. 36 (1890), *State of Oregon,* 36 L.D. 36 (1908). It is most difficult for this Court to accept the Solicitor's second step, i. e., that the phrase "actual resident" envisions one family per 160-acre tract, in light of the actual language used in the statute.

A number of rules of statutory construction were employed in the first part of this opinion and those rules are equally applicable here. The wording of the statute is free from ambiguity as the word "person" is modified by the word "one." While the wording excludes more than one Carey Act entry per person, to read the word "person" to mean "family" or "husband and wife" rewrites the statute.

■ Since the wording of the Act is free from ambiguity, the legislative history need not be consulted, yet, in order to gain further insight into the intent, the Congressional Record may be consulted. The history does not reveal that a different meaning was intended than the literal meaning of the words used. The following passages support a literal interpretation of the statute, and, although the debate reflects a desire to effectuate development of homes upon the desert domain, such a desire fails to indicate that a husband and wife were excluded from making a 160-acre entry each.

■ In the House, the Senate Report prepared by Mr. Carey was read in the record. The report states in part:

" . . . The title is not to pass out of the Government until the two chief conditions of the bill are fully complied with. First, that the lands shall be fully reclaimed; and second, that the land shall be settled upon in tracts not exceeding 160 acres to *each settler.*

\* \* \* \* \* \*

"If the States complied with the conditions of the act, the lands would be reclaimed, settled upon, and disposed of to actual settlers in small tracts thereby accomplishing the same purpose as is contemplated by the homestead laws of the United States." 26 Cong.Rec. 8390 (1894) (Emphasis added)

Commissioner Lamoreux stated, in part, in a letter introduced in the House:

" \* \* \*

"The bill further provides that when competent proof is furnished by any State that any of the lands reserved are re-

claimed and occupied by actual settlers, in tracts not exceeding 160 acres to *each settler,* patents shall issue to the State or its assignees for such lands so reclaimed and settled in tracts not exceeding .160 acres to *each person,* . . ." Id. (Emphasis added)

"Mr. McRAE. . . . One of the conditions of this measure is that not exceeding 160 acres shall be sold by the State to any *one individual."* Id. at 8391.

\* \* \* \* \* \*

"Mr. BRYAN. . . . But certainly no one will object to allowing these States to take these lands, useless to us as a nation, and irrigate them, make them valuable, and then sell them to *citizens who will establish homes* upon them. This amendment provides that these lands shall not be disposed of in greater quantities than 160 acres to *one person."* Id. at 8419 (Emphasis added)

\* \* \* \* \* \*

"Mr. BRYAN. . . . It seems to me, Mr. Speaker, that this measure gives a promise of very great good, because the more *homes* we can establish, the more independent citizens we can put upon our lands, the more stable is the Government under which we live, and the more general will be our prosperity . . ." Id. at 8420 (Emphasis added)

"Mr. HERMAN. . . . Let the bill so protected be passed, for our people will welcome it as the best we can secure, and while we are doing this it behooves us to guard every provision which otherwise may be construed adversely to the interests of the real beneficiaries for whom this legislation is had—the *home-seeking* and *home-deserving* people of the United States . . ." Id. at 8424 (Emphasis added).

\* \* \* \* \* \*

"Mr. ELLIS of Oregon . . . . This act, if passed, does not suspend the desert land act, nor prevent those who desire to take land directly from the Government from doing so, provided they comply with the law, rules, and regulations. It only enables the State to do what the individual by reason of poverty can not do, and after it has made the land fertile and the prospect of obtaining an easy living therefrom, then the man who could not accomplish the result alone may come in and *purchase for himself and family a home,* his success will be assured, and the State or General Government will in no sense be losers . . ." (Emphasis added) Id. at 8425.

\* \* \* \* \* \*

"Mr. LUCAS. . . . It seems to me that the bill is explicit and careful in its provisions, guarding all the rights of the Federal Government. The title can not pass to the State until reclamation is secured and then must be awarded to settlers in *160-acre lots for bona fide homes."* Id. at 8430 (Emphasis added)

Even if the phrase "any one person" could have different meaning, the Government's construction is out of harmony with the rule of construction used by the Secretary, namely, where words admit of different meanings, it would be right to adopt that which is more favorable to the interests of the public. *J. B. Raymond,* 2 L.D. 854 (1884).

The Secretary relies heavily on Land Decisions under the Homestead Act. Such decisions hold that two entries by a husband and wife are precluded by the Act and further, that a house constructed on the dividing line between two tracts will not validate such entries. *Case v. Kupferschmidt,* 30 L.D. 91 (1900), *Jane Mann,* 18 L.D. 116 (1894), *Lincoln v. Gisselberg,* 17 L.D. 215 (1893), *William A. Parker,* 13 L.D. 734 (1891), *Stella G. Robinson,* 12 L.D. 443 (1891), *Emma F. Stewart's Heirs,* 12 L.D. 197 (1891), *John O. and Minerva C. Garner,* 11 L.D. 207 (1890), *Bullard v. Sullivan,* 11 L.D. 22 (1890), *Thomas E. Henderson,* 10 L.D. 266 (1890), *L. A. Tavener,* 9 L.D. 426 (1889). *But see: Bloom v. Holmes,* 44 L.D. 148 ·(1915), *Patrick Flynn,* 39 L.D. 593 (1911), *Anderson v. Hillerud,* 33 L.D. 335

(1904), *Emily M. Dronberger,* 10 L.D. 88 (1890).

The above decisions were issued pursuant to the Homestead Act and for that reason they cannot be precedent for construing the Carey Act. Each statute has different wording, and the Secretary has recognized that the Department's rulings are controlled by the language used in the act in question.[6] *Selway v. Flynn,* 6 L.D. 541 (1888). In *Selway v. Flynn,* which involved entry by a married woman under the Desert Land Act, the ruling subject of the appeal was as follows:

"I am of the opinion that the desert land act should be construed with reference to the relations and disqualifications of coverture at common law and as it forbids more than one entry of six hundred and forty acres by one person that it did not intend that a married man and woman should each be allowed an entry thereunder. I am aware that there have been decisions holding to the contrary, but with my views on the subject, I must decline to follow said precedents. I therefore sustain your original decision rejecting Mrs. Selway's application . . . ." *Supra,* at 542.

On appeal the Commissioner reached a contrary result in light of the language of the Desert Land Act:

"I cannot agree with you that the law providing for the sale of desert lands prohibits the entry thereunder by a married woman. The statute provides:— 'It shall be lawful for any citizen of the United States or any person of requisite age who may be entitled to become a citizen, and who has filed his declaration to become such, and upon payment of

twenty-five cents per acre to file a declaration, etc.'

"In the face of these provisions of the statute I have discovered no good reason for changing the construction of the law adopted by this Department in former decisions." Id.[7]

While residence on the land is not required under the Desert Land Act, *Cox v. Hart,* 270 F. 51 (9th Cir. 1921), *affirmed,* 260 U.S. 427, 43 S.Ct. 154, 67 L.Ed. 332 (1922), that does not command a different result for it is the wording and its clear meaning of the Carey Act which is controlling. To the extent that the rulings previously referred to under the Homestead Act were premised on a presumption that a wife's residence is that of her husband, it is notable that Idaho, by Section 2013, Idaho Code, Title 42, has seen fit to permit both husband and wife to make entry.[8] More importantly, to premise a denial of the right to make an entry upon such a presumption would, as has previously been stated, flout the language of the Carey Act.

This Court is not aided in this part of the Memorandum Decision by a contemporaneous opinion of the Department of the Interior at the time of passage of the Act; rather, the Department has relied upon precedent from other acts which are not controlling. All total, it follows under the language of the Carey Act, legislative history, as well as Department constructions of acts with closely-similar language, that a husband and wife are each entitled to make a 160-acre entry.

This Court is of the view that since a husband and wife are entitled to make adjoining entries under the Carey Act of 160 acres each, that a house on the dividing line

---

**6.** *See also:* the reasoning and analysis of statutory language in *Delila Stukel,* 10 L.D. 47 (1890) holding valid an entry by a married woman under the Timber & Stone Act of 1878 and ruling that such an interpretation was consistent with construction of the wording used in the Desert Land Act.

**7.** On September 30, 1910, the Department of the Interior issued a circular as follows:

"Thus, a woman, whether married or single, who possesses the necessary qualifications, can make a desert-land entry, and, if married, without taking into consideration any entries her husband may have made." 39 L.D. 253 (1910)

**8.** To deny either a husband or wife the right of entry on the ground that either has previously made an entry may have constitutional ramifications; however, that issue is not addressed in this Memorandum Decision.

between the adjoining tracts satisfies the settlement and residency requirement. It is not contested that an actual residence on the tract is required. To require a husband and wife to divide their home by a breezeway or the like, or to construct separate residences on each tract would cause disutility. Such an economic restraint may well prohibit settlement in conflict with the intent of the Act. To impose such a restriction strikes this Court as an illogical selection of form over substance.

Moreover, construction of a house on the dividing line is permitted under case law and satisfies the residence requirement. *Silver v. Ladd,* 7 Wall. 219, 74 U.S. 219, 19 L.Ed. 138 (1869), *following, Lindsey v. Hawes,* 2 Black 554, 67 U.S. 554, 17 L.Ed. 265 (1863); *see also: George T. Burns,* 4 L.D. 62 (1885), *So. Pac. R. R. Co. v. Rahall,* 3 L.D. 321 (1885), *Wright v. Woods,* 1 C.L.L. 304 (1875).

The defendant's motion for summary judgment is GRANTED as to the issue in Part I of this decision. The decision of the Interior Board of Land Appeals (21 IBLA 210) is AFFIRMED as stated in Part I of this decision.

The plaintiffs' motion for summary judgment as to the issues discussed in Part II of this decision is GRANTED.

Within five (5) days from the date of receipt of a copy of this Memorandum Decision and Order, counsel for each of the parties will prepare and submit to the court a proposed summary judgment effectuating this decision and order.